**Edward Lorenzo REASE, Plaintiff,**

v.

**Joanne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. 1:04–CV–3239–JMF.**

United States District Court, N.D. Georgia, Atlanta Division.

April 12, 2006.

Edward Lorenzo Rease, Marietta, GA, pro se.

Robert David Powell, Office of United States Attorney, Northern District of Georgia, Atlanta, GA, for Defendant.

## MAGISTRATE JUDGE'S FINAL ORDER

FELDMAN, United States Magistrate Judge.

This is a *pro se* action to review the determination by the Commissioner of Social Security ("the Commissioner") that Edward Lorenzo Rease is not entitled to a period of disability, or disability insurance benefits ("DIB") under §§ 216(i) and 223(a), and 1614(a)(3)(A) of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(a), and 1382.

*PART ONE HISTORY OF THE CASE*

On May 5, 1999 the claimant filed the instant application for a period of disability and DIB and/or SSI. In the combined application for DIB, the claimant alleged that he had been disabled since August 6, 1998 due to mental and physical health problems, including depression, panic attacks, and spinal injuries. Tr. 87–89, 101. The application was denied initially on July 8, 1999 and on reconsideration on October 20, 1999. Tr. 16, 17; 18–21; 24–27. On October 26, 2000, Administrative Law Judge (ALJ) Kelly Jennings held a *de novo* hearing and received testimony from the claimant and Mr. Earl Thompson, a vocational expert (VE). Tr. 673–705. On November 24, 2000, the ALJ rendered a decision adverse to the claimant. Tr. 34–39.

The claimant appealed that adverse decision to the Appeals Council (AC), which, on June 18, 2002, granted review and remanded the case to the ALJ with directions to (a) address the claimant's 1999 earnings and whether he had performed work at the substantial gainful activity (SGA) level since his alleged date of dis-

ability onset; (b) properly evaluate the claimant's credibility; (c) obtain updated medical information from any treating sources, and then provide the rationale for the weight he assigned to each medical opinion and assessment of record, (d) discuss the rationale for his conclusions regarding the claimant's specific limitations and residual functional capacity, (e) consider obtaining one or more comprehensive mental status consultative examinations, and (e) conduct a new *de novo* hearing and obtain supplemental evidence from a VE to clarify the effect of the claimant's limitations on his ability to do his past relevant work or other work existing in significant numbers in the regional or national economies. Tr. 84–86.

On April 23, 2003, the ALJ conducted a new *de novo* hearing at which he received new medical records from the claimant; and also received testimony from the claimant, Dr. Suzanne Cullins, M.D. (a medical expert), Dr. Neal Lewis, Ph.D. (a psychologist), and Dr. Laura Sewell, Ph.D., a VE. Tr. 706–47. On October 30, 2003, the ALJ rendered another adverse decision. Tr. 515–522. On August 25, 2004, the Appeals Council declined to review the ALJ's decision (Tr. 6–9), thereby making the ALJ's new adverse decision the final decision of the Commissioner.[1] Thereafter, the claimant appealed the decision to the District Court. This case is now ripe for review under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

*PART TWO* *THE ISSUES*

1. Whether the Commissioner's decision that the claimant can perform substantial gainful activity (SGA) is supported by substantial evidence;

2. Whether the ALJ denied the claimant a full and fair hearing—

a. whether the ALJ properly evaluated the claimant's subjective testimony;

b. whether the ALJ properly considered the claimant's impairments in combination;

c. whether the ALJ was correct in not using the Medical Vocational Guidelines to determine whether the claimant was disabled.

d. whether the ALJ properly considered the opinion of the claimant's treating physician, Dr. Steven Marrinson;

e. whether the ALJ properly fulfilled his duty to develop a full and fair record

f. whether the ALJ's hypothetical questions to the VE included all undisputed evidence of the claimant's impairments. And

3. Whether this Court should remand the case to the Commissioner pursuant to Sentence 4 of 42 U.S.C. § 405(g).

*PART THREE* *THE STANDARD FOR REVIEW*

■ The claimant bears the initial burden of proving that he is disabled, which burden is met when he proves that he suffers from a terminal impairment or a severe impairment that is expected to last at least twelve months and renders him unable to pursue his customary employment. Thereafter, the burden shifts to the Commissioner to prove that the claimant can, nevertheless, perform other types of substantial gainful activity. *Freeman v. Schweiker*, 681 F.2d 727 (11th Cir.1982). In determining whether a claimant is disabled within the meaning of the Social Security Act, the Commissioner is required to consider:

(1) Objective medical facts or clinical findings;

---

1. The claimant submitted a brief and, *inter alia,* medical records to the AC, which medical records were duplicates of records already sent to the ALJ either before or after the second *de novo* hearing.

(2) Diagnosis of examining physicians;

(3) Subjective evidence of pain and disability as testified to by the claimant and corroborated by his wife or other members of his family, his neighbors and others who have observed him; and

(4) The claimant's age, education and work history....

*DePaepe v. Richardson,* 464 F.2d 92, 94 (5th Cir.1972); *Bloodsworth v. Heckler,* 703 F.2d 1233 (11th Cir.1983).

The Commissioner, in reaching his determination, must also follow a five step sequential evaluation process. 20 C.F.R. §§ 404.1520 (1986). First, the Commissioner must look at whether the claimant is working. A claimant presently engaged in substantial gainful activity ("SGA"[2]) is declared not disabled and the inquiry ceases. 20 C.F.R. §§ 404.1520(b) (1986).

If the claimant is not engaged in substantial gainful activity, the Commissioner must determine whether he suffers from a severe mental or physical impairment.[3] If the impairment is not severe, the claimant is declared not disabled. 20 C.F.R. § 404.1520(c). If his impairment is severe, it meets the durational requirements, and it equals or exceeds a "listed" impairment, the claimant is considered disabled. 20 C.F.R. § 404.1520(d)(1986).

If the claimant's severe impairment does not equal or exceed a listed impairment, the Commissioner must then determine the claimant's residual functional capacity (i.e., the degree to which the claimant can function, despite all of his physical or mental impairment(s)). In addition to considering all of the claimant's impairments, the Commissioner must also evaluate the physical and mental demands of the claimant's past relevant work, and whether the claimant can meet those demands, given his residual functional capacity. 20 C.F.R. § 404.1520(e)(1986); *Perez v. Schweiker,* 653 F.2d 997 (5th Cir.1981).

If the claimant cannot perform his past relevant work, then the Commissioner must decide whether the claimant's impairment(s) prevent him from doing any other SGA. 20 C.F.R. § 404.1520(g). In the event the impairment(s) preclude other SGA, a finding of disability is mandated.

■ It must also be recognized that hearings before the Commissioner (*nee* the ALJ and the AC) are non-adversarial in nature, and oblige the adjudicator (AC and ALJ) to ensure that the hearing record is complete. Specifically, it is the adjudicator's duty to investigate the facts and develop the arguments, both for and against granting benefits. *Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80, 88 (2000); *Wilson v. Apfel,* 179 F.3d 1276, 1278 (11th Cir.1999); *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997) *Welch v. Bowen,* 854 F.2d 436 (11th Cir.1988); *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir.1981). Furthermore, the ALJ must comply with this obligation even if the claimant is represented by counsel. This Court's review of the case is generally limited to a consideration of the evidence in the certified record.[4] *Wilson v. Apfel,* 179 F.3d at 1279.

**2.** SGA represents the amount of work, measured in gross wages, that a claimant may earn before he will be considered not eligible for disability benefits. SGA involves doing significant physical or mental activities that are usually done for pay or profit, whether or not a profit is realized. Work can be considered substantial even if it is done on a part-time basis, or if less money is earned or work responsibilities are lessened from previous employment. 20 C.F.R. 404.1572.

**3.** A medically determinable impairment or combination of impairments is severe if it significantly limits an individual's physical and mental ability to do basic work activities. 20 C.F.R. § 404.1521.

**4.** Of course, under appropriate circumstances, this Court can consider new relevant

■ The duty of this Court is not to decide facts anew, re-weigh the evidence, or substitute its judgment for that of the agency, but rather to determine if the agency's conclusion, as a whole, was supported by substantial evidence in the record, and whether the Commissioner applied the correct legal standards. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *Phillips v. Barnhart*, 357 F.3d 1232, 1240, n. 8 (11th Cir.2004); *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir.1995)(citing 42 U.S.C. § 405(g)); *Smith v. Bowen*, 792 F.2d 1547, 1549 (11th Cir.1986).

■ Substantial evidence has been defined as "more than a scintilla, but less than a preponderance." *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir.1987); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir.1982). The evidence must be such that "a reasonable mind might accept it as adequate to support the [Commissioner's] conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990).

■ In considering the evidence in the record, this Court must consider the record as a whole. It may not affirm the Commissioner's decision by referring only to those parts of the record which support the same conclusion. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir.1983). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456, 467 (1951) (Frankfurter, J.). However, if the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the evidence preponderates against the Commissioner's decision. *Dyer v. Barnhart, supra; Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158 (11th Cir.2004); *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir.2003).

## PART FOUR EVALUATION OF THE EVIDENCE

### A. THE OBJECTIVE MEDICAL EVIDENCE

The claimant has an extensive history of treatment for physical problems dating back to his military service in the late 1970's and mental problems (i.e., depression and anxiety), documented for the first time of record in 1997. The claimant apparently received medical treatment from (1) military physicians (signatures illegible) while he was serving on active duty with the U.S. Army; and these records, from June 1976 through February 1980, are found at Tr. 375–423. The claimant has also received medical treatment from: (2) Dr. Ken Logan of the Logan Chiropractic Life Center, from September 6, 1989 to December 13, 1989 (Tr. 143–154); (3) Kennestone Hospital from May 13, 1999 to June 25, 1999 (Tr. 303–319), from October 27, 1990 to April 2, 1999 (Tr. 267–282), and from June 20, 2002 through February 1, 2003 (Tr. 443–456); (4) Dr. Mark I. Harris, M.D. from November 6, 1990 to June 17, 1991 (Tr. 160–173); (5) Shallowford Community Hospital on January 16–18 and June 20–21, 1991 (Tr. 155–159;174–184); (6) Dr. Bert A. Loftman, M.D., at Piedmont Hospital from August 27, 1991 to July 2, 1998 (Tr. 212–214), including surgery on September 5, 1991, and therapy from February 18 to March 4, 1992 (Tr. 185–211); (7) Kennesaw Family Physicians, from November 17, 1990 to October 22, 1998 (Tr. 242–266); (8) Dr. Beverly L. Boyd, Ph.D. at Georgia Neurology Associates, from July 2, 1997 to January 11, 1998 (Tr. 361–374); (9) Dr. Jeffrey Klopper, M.D. and Dr. George Rowe, M.D. at Atlan-

medical evidence in support of a properly filed motion for remand.

ta Psychiatry and Neurology, from September 4, 1997 to May 21, 1999 (Tr. 287–300); (10) Dr. Stanley M. Fineman, M.D., from January 17, 1986 to July 8, 1998 (Tr. 215–233); (11) Dr. Mark Kassels, M.D., from April 10, 1998 to October 9, 1998 (Tr. 237–41); (12) Crawford Long Hospital on September 10, 1998 (Tr. 234–236); (13) Dr. Felicia Pierre, D.P.M. at the Smyrna Clinic from July 13–20, 1998 (Tr. 431–435); (14) Dr. Alan Maloon at Marietta Neurological Associates, from April 28, 1999 to May 13, 1999 (Tr. 283–286); (15) Dr. Barry N. Straus, M.D. at Pain Medicine Specialists, from August 11–20, 1999 (Tr. 329–331); (16) by Dr. Richard J. Stork, M.D., at Pain Consultants of Atlanta, LLC in March 2000, and then from May 24, 2002 to October 17, 2002 (Tr. 438–442); and (17) Piedmont Medical Center from May 24, 2002 through May 5, 2003 (Tr. 457–501, 436–437).

The claimant was also evaluated by two consulting psychologists: (18) Dr. Steven Marrinson, Ph.D.[5] on October 19 and 24, 2000 (Tr. 348–360); and (19) Dr. David B. Rush, Ph.D., on September 23, 2002 (Tr. 424–430). The claimant's medical records were reviewed by (23) Dr. Robert Willingham, Jr., M.D., a non examining state agency orthopedic consultant, on June 24, 1999 (Tr. 301–302), and September 10, 1999 (Tr. 332–347).[6]

*Treating Medical Providers*

1. The *Claimant's Military Medical Records*

The claimant's military medical records from June 1976 through February, 1980. (Tr. 375–423) show that he suffered frostbite to his feet during field training in 1976; in May 1977, he complained of pain in his feet and cramping in his hands during cold weather; and in October 1977, military medical personnel (signature illegible) diagnosed the claimant with possible arthritis. Tr. 410–411, 414–416, 418.

In April 1978, Dr. James F. Morgan, M.D. limited the claimant's duties to exclude walking more than one mile; running or double timing; and exposure to temperatures below 32 degrees Fahrenheit, due to his feet. Tr. 412 The claimant also had an orthopedic consultation on February 7, 1978; and the doctor diagnosed him as suffering from Pes Planus in both feet and gave him arch supports. Tr. 411.

On November 27, 1978, another military physician, Dr. James B. VanDelden, M.D., determined that the claimant was qualified for separation from the service (i.e., discharge) because of the cold injury (frostbite) he had sustained to his feet. Tr. 409. The doctors further restricted the claimant to no daily exposure to cold in excess of five minutes per hour; no exposure below 40 degrees Fahrenheit; and no continuous wearing of combat boots in excess of 15 minutes per hour. Tr. 388, 402. Although the claimant has reported that he was injured in a helicopter accident, his military medical records are devoid of any indication thereof.

2. *Dr. Ken Logan/Logan Chiropractic Life Center*

On September 6, 1989, Dr. Kenneth O. Logan, a chiropractor, evaluated the claimant in connection with his complaints of cervical pain. The claimant also com-

---

5. The claimant contends that Dr. Marrinson was a treating physician; and, therefore, the ALJ was obliged to give his opinion great weight.

6. The claimant's medical records also include an unsigned Psychiatric Review Technique

Form (PRTF), dated July 6, 1999, indicating that the non examining medical consultant reviewed the claimant's medical records and found "insufficient medical evidence" of a mental impairment at that time (Tr. 320–328). The PRTF fails to identify the records that the physician reviewed at that time.

plained that he felt like pins and needles were inserted into his left arm and shoulder; he had thoracic and lumbar pain; he felt like pins and needles were shooting down his legs; and he had sinus problems. Tr. 151–154. Dr. Logan provided the claimant with chiropractic treatment for the next two and a half months for, *inter alia*, an L–5 subluxation. He also took cervical and lumbar x-rays on November 29,1989. Tr. 143–154. The results of these x-ray are not in the claimant's record.

### 3. *Kennestone Hospital*

On October 26, 1990, the claimant was involved in a motor vehicle accident; and he was taken to the Kennestone Hospital ER on October 27, 1990 complaining of neck pain. The ER physician examined the claimant, diagnosed him with a cervical strain, and gave him a soft collar, medication (Nalfon and Lorcet, and instructions to apply heat to his neck and avoid any lifting). Tr. 281–282.

The claimant was next seen at the Kennestone ER five years later, on May 15, 1995, with complaints of low back pain. In the intervening years, as described in more detail *infra,* the claimant had continued to suffer with neck pain radiating into his left shoulder and arm; and he had low back pain. In 1991, Dr. Bert A. Loftman performed a cervical fusion at C3–4 and C4–5. The claimant returned to work but continued to have constant pain, and received physical therapy in 1992 with minimal improvement. The record is devoid of further treatment for complaints of neck

or back pain until May of 1995, when the claimant complained to his physician at Kennesaw Family Physicians that he was suffering with low back pain.[7]

On May 15, 1995, Dr. Thomas C. Spilker, M.D. examined the claimant and noted that he had pronounced bilateral pain on straight leg raising; but the claimant's deep tendon reflexes were normal. Dr. Thomas Hinz, M.D. performed an intravenous pyelogram to determine whether the claimant's pain was musculoskeletal or due to a kidney stone. However, the test results were normal. Tr. 277–278.

Four years later, on April 2, 1999, the claimant again returned to the Kennesaw ER, complaining of low back, groin and neck pain. At that time Dr. Samuel Bone, M.D. took lumbar x-rays, but found no signs of lumbar fracture or subluxation. Tr. 271, 274. In the interim, as discussed in more detail *infra,* the claimant suffered from allergy problems; was diagnosed with glaucoma at the age of forty; was diagnosed with severe plantar fasciitis in both feet which improved with therapy and permanent arch supports; and allegedly was suffering harassment and discrimination at work; and several doctors[8] treated him for depression and anxiety between July 1997 and May 1999. In fact, on August 15, 1997, Dr. Beverly Boyd, Ph.D. diagnosed the claimant as so depressed and anxious that he was unable to work; and he subsequently went on a disability leave of absence, and his employer terminated him on March 28, 1999.[9]

---

7. See the claimants records with Dr. Mark I. Harris, M.D., Shallowford Community Hospital (Dr. Arthur L. Mulick, M.D.), and Dr. Bert A. Loftman, M.D. *infra.*

8. See Dr. Beverly L. Boyd, Ph.D., Dr. Jeffrey Klopper, M.D. and Dr. George Rowe, M.D., *infra.* For the time period of May 1995 to April 1999, see also, *infra,* the claimant's records with Dr. Mark Kassels, M.D., Crawford

Long Hospital, Kennesaw Family Physicians, Dr. Stanley M. Fineman, M.D., and Dr. Felicia Pierre, D.P.M.

9. The claimant alleges that he was terminated while he was on disability leave. The record is not clear as to whether the claimant was on disability benefits for the entire period between August 15, 1997 and March 28, 1999.

From May 28 to June 16, 1999, physical therapists at the Kennestone Hospital provided the claimant with therapy for heightened neck and upper back pain. Tr. 313. On June 16, 1999, a therapist (whose signature is illegible) discharged the claimant because, after five therapy sessions, he continued to complain of increased pain and had shown no improvement. Tr. 318. The claimant's pain was still fairly severe; he could only lift very light weights; and his neck pain made it difficult for him to read and work.[10] He was also unable to drive his car for a long period of time; had moderately disturbed sleep; needed some help with his activities of daily living;[11] and stated that he could barely do any recreational activities. Tr. 307–308.

On April 28, 1999 the claimant had a neurological consultation with Dr. Alan Maloon, M.D. of Marietta Neurological Associates, who recommended that the claimant have a new cervical MRI. The claimant returned to Kennesaw Hospital on June 25, 1999, and Dr. Bonnie Anderson, M.D., a radiologist administered the MRI and found that the claimant had (1) osteophytes causing small impressions on the thecal sac in the area of the claimant's fusion (C–3 through C–5); and (2) a right paracentral posterior protrusion of the C5–6 disc creating a small impression on the thecal sac.

The record is devoid of any further treatment notes from Kennestone Hospital between June 26, 1999 and June 19, 2002. During that period, as discussed in more detail *infra*, Dr. Barry N. Straus, M.D. of Pain Medicine Specialists administered cervical epidural steroid injections; Dr. Richard J. Stork, M.D. of Pain Consul-

tants of Atlanta administered a trigger point injection in the claimant's left trapezius, diagnosed degenerative disk disease in the claimant's cervical spine and possible degenerative disk disease in the claimant's low back, as well as myofascial pain syndrome; and Dr. Steven Marrinson performed a psychological consultative evaluation, and diagnosed the claimant as suffering from Major Depression, secondary to chronic physical problems. In May 2002, the claimant started physical therapy at Piedmont Hospital.

The claimant returned to Kennesaw Hospital on June 20, 2002, for a new cervical MRI (as requested earlier by Dr. Stork). Dr. George McCord, M.D. administered the MRI and found (1) mild posterior spurring at the C3–4 and C4–5 levels post-surgery; (2) mild bulging of the C2–3 disc making a mild impression upon the thecal sac, without central spinal stenosis or any affect on the neural foramina; (3) focal disc protrusion into the spinal canal anteriolaterally and centrally to the right, making a moderate impression upon the thecal sac at C5–6, which was a significant change since the claimant's June 1999 MRI; and (4) mild bilateral neural foramina narrowing at C6–7, without any significant spurring or impression upon the thecal sac. Tr. 451–452.

On December 17, 2002, the claimant returned to Kennestone Hospital for an aquatic physical therapy program, as ordered by Dr. Stork, who on October 17, 2002 had diagnosed the claimant with fibromyalgia. Physical therapist Meredith Orr evaluated the claimant and noted that the claimant had a long history of fibromyalgia symptomology, although Dr. Stork

---

**10.** The claimant's prior employer had terminated him; the claimant subsequently worked at a Sheraton hotel for a month and a half, at some point after May 5, 1999 (as the claimant did not list such work on his May 5, 1999 DIB application).

**11.** Activities of daily living (ADLs) include bathing, dressing, eating, toileting, transferring and continence.

had only recently diagnosed him as suffering from fibromyalgia. At that time the claimant was very limited by his pain which fluctuated in intensity such that sometimes he was unable to walk, although he was able to walk on the day of his evaluation. The claimant also complained that he would collapse on the floor from fatigue; his whole body ached; he was unable to sleep; he was depressed; and he was upset that he had been gaining weight. He had rigid movements; his shoulders were elevated; his ambulation was guarded; and he was unable to stand straight. Tr. 447. On December 27, 2002, after four therapy sessions, the claimant reported that his pain had decreased and he was more flexible, except in his thoracic area. Tr. 446 He returned for treatment on December 30, 2002. Tr. 453. The record is devoid of any further treatment notes from Kennesaw Hospital after that date, which is also the date of record of treatment received from any physician.

### The Claimants Other Treating Physicians, Already Mentioned Above

#### 4. Dr. Mark I. Harris, M.D.

On November 6, 1990, Dr. Mark I. Harris, M.D. evaluated the claimant for complaints of continued pain since his October 26, 1990 motor vehicle collision.[12] The claimant reported that prior to that accident he had no neck or low back injury.[13] Since his accident, he continued to have sharp neck pain, and some discomfort in his left hip and buttocks, with tingling in the left lower calf and toes, for which he was taking Nalfon and Lorcet. Dr. Harris noted that the x-rays taken at Kennestone Hospital immediately after the claimant's accident were negative, and he referred the claimant to Dr. Richard M. Wolfman, M.D. of the North Atlanta Imaging Center, for a cervical MRI. Dr. Wolfman administered the MRI and found that the claimant had a herniated disc or severe annular bulge at C3–4 and C4–5, with associated cord compression at the upper level. Tr. 171–173

The claimant returned to Dr. Harris on November 26, 1990, still suffering from neck pain radiating into his left shoulder and upper arm, and some numbness and tingling in his left arm. Dr. Harris started the claimant on home cervical traction, and physical therapy; and continued him on medication (Nalfon and Robaxin). Tr. 170. The claimant reported that he was only getting temporary relief from the traction and physical therapy; and Dr. Harris advised the claimant to have a cervical epidural block, which was a three-day inpatient procedure. Dr. Harris apparently administered the epidural block; and, on February 2, 1991 the claimant reported significant improvement. Tr. 167–169. On April 4, 1991, the claimant described his neck pain as more of a "discomfort." He had also missed his therapy sessions because he had gone out of town. Nevertheless, he was feeling better; and, in retrospect, he thought that therapy may actually have exacerbated his symptoms. Tr. 166.

One month later, on May 9, 1991, the claimant returned to Dr. Harris, complaining of significant problems with his neck, including occasional severe flair-ups. He also complained that his left shoulder felt out of place; and he had pain in his left shoulder and intrascapular region. Dr. Harris diagnosed the claimant as suffering from myofascial pain; and he prescribed

---

12. Dr. Harris' records indicate that the claimant reported being involved in a head-on collision; whereas Dr. Maloon's records indicate that the claimant's vehicle was read-ended.

13. But see, Dr. Maloon/Marietta Neurological Associates, *infra*, to whom the claimant gave a history of injury while in the military.

nonsteroidal anti-inflammatories and heat. Tr. 165. He ordered the claimant to have x-rays; and, on May 11, 1991, Dr. Arthur L. Mulick, M.D. took the x-rays; and they showed no abnormality, fracture or dislocation. Tr. 164.

On May 17, 1991, Dr. Harris recommended that the claimant try a TENS unit; start neuromuscular therapy; and continue taking Voltaren. When the claimant asked him to recommend a neurosurgeon, Dr. Harris gave him the names of Dr.'s Schlachter, Kaufman and Disch. Apparently the claimant made an appointment and saw Dr. Disch, as the records reflect that, on May 21, 1991, Dr. Disch advised Dr. Harris that he had seen the claimant and recommended further testing, and that the claimant undergo an anterior cervical diskectomy and fusion. Tr. 162.

5. *Shallowford Community Hospital*

On June 20, 1991, the claimant (age 32) was admitted to the Shallowford Community Hospital, by Dr. Harris, for pre-surgical testing. Tr. 178. Dr. Arthur L. Mulick, M.D., took cervical and lumbar myelograms; followed by cervical and lumbar CT scans.[14] The claimant's cervical myelogram showed a mild anterior indentation on the cervical thecal sac at C4–5, with no nerve root cut-off. Tr. 183–184. The cervical CT scan also showed a "bulge versus mild posterior disc herniation at C6–7, with no definite cord or nerve root impingement, the significance of which was uncertain; and Dr. Mulick advised the claimant to obtain clinical correlation." Tr. 182.

Dr. Mulick's myelogram of the claimant's lumbar region showed that the claimant had a bulging disc at L4–5, and anterior indentations on the thecal sac at L5–S1,

as well, which suggested he also had a mild disc herniation at L5–S1, with mild impingement on the left S1 nerve root. Tr. 183–184. The claimant's lumbar CT scan also suggested that he had a mild disc herniation at L5–S1, with slight impingement and posterior displacement of the left S1 nerve root; and a mild to moderate disc bulge at L4–5. Tr. 180–181.

6. *Dr. Bert A. Loftman*
*Piedmont Hospital*

Three months later, on August 27, 1991, the claimant saw Dr. Bert A. Loftman, M.D., a neuro-surgeon, for a clinical evaluation as to whether surgery was appropriate. Dr. Loftman evaluated the claimant and recommended that he have an anterior diskectomy at C3–4 for pain relief, and to prevent further spinal cord injury; and that he should have surgery on the disc at C4–5 at the same time. As the claimant complained of persistent pain, Dr. Loftman scheduled surgery for the following week. He performed an anterior cervical micro-diskectomy at C3–4 and C4–5 on September 5, 1991; and discharged the claimant from Piedmont Hospital on September 9, 1991 (Tr. 186–204).

Five months after his surgery, the claimant was still experiencing left shoulder pain and neck pain; and, on February 18, 1992, he started rehabilitation services at Piedmont Hospital. Tr. 209–211. The claimant had returned to work, which required him to sit at a computer eight hours a day. He had also returned to physical activities, including bike riding and running. He complained that he was suffering from constant pain ranging from 2 to 7 on a scale of 0–10; and his pain was worse when he propped his left arm at a 90 degree angle, and when he was working on his computer, driving, or doing any heavy

**14.** Dr. Harris, M.D. administered a lumbar puncture, which apparently was reported separately; that report is not in the record.

physical work. After three weeks of therapy, the claimant reported that his shoulder pain was still intense, although it was not constant. Tr. 208. Physical therapist, Karen S. Tarleton, PT discharged the claimant from therapy on March 4, 1992, because, he reported only minimal improvement, although his cervical range of motion had improved slightly. Tr. 206–207.

Six years later, on July 2, 1998, the claimant asked Dr. Loftman for a statement of his work-related restrictions. Dr. Loftman advised that the claimant's cervical surgery in 1991 (which was stable with a good fusion) and the claimant's degenerative lumbar disc disease at L4–5 and L5–S1 (by history), resulted in "more or less" permanent work restrictions, to wit: (1) no excessive cervical or lumbar bending, lifting, twisting, torqueing; (2) no kneeling, squatting, reaching, overhead, pushing or pulling with upper or lower extremities; (3) no standing, sitting or walking for longer than 2 hrs., without a break of ten minutes; and (4) no lifting more than 20 lbs., or carrying more than 15 lbs. Dr. Loftman also sent a copy of the foregoing restrictions to Dr. C. Dirk Williams at the Kennesaw Family Physicians. Tr. 212, 213.

### 7. Kennesaw Family Physicians

Kennesaw Family Physicians [15] provided the claimant with treatment between November 17, 1990 to October 22, 1998. The claimant's records show that most of his treatment was for sinus problems and plantar fasciitis Tr. 242–266.

On May 19, 1995, the claimant also complained of back and groin pain; and he reported that he had been suffering from low back pain since a motor vehicle accident in 1990. Tr. 255–258. On August 7, 1997, the claimant also complained that he had been suffering from depression for over twelve years. He reported that he was having discrimination problems at work; he had thoughts of hurting someone at work, but had no plans to do so; he also had suicidal ideation, but no suicidal plan. The claimant also stated that he was tired all the time; he had sleep problems; and he had lost his interest or any sense of enjoyment in life. His family physician referred him to a psychiatrist, Dr. Klopper. Tr. 250–249.

### 8. Dr. Beverly L. Boyd, Ph.D.

Dr. Beverly L. Boyd, Ph.D., a psychologist with the Georgia Neurology Associates, began treating the claimant for depression on July 21, 1997, at which time he complained of being under stress and being very frustrated because of his work. Although he had received outstanding ratings, he had not received a promotion in fourteen years; and he felt that his employer was discriminating against him. He was also upset because he had gained weight; his family had suffered financially and socially; his social life was very limited; and he had trouble sleeping. However, he was still happily living with his wife; and was working on a master's degree in organization management via a correspondence program at Walden University. Tr. 372–374. The claimant gave a history of a very troubled childhood,[16] and previous sinus and neck surgery. He was taking, *inter alia*, Doxepin HCL 50 mg. and Wellbutrin 150 mg. Dr. Boyd observed that the claimant's affect was depressed, and he

---

**15.** Dr. Laurin G. Smith, M.D. and Dr. Dirk Williams were at the Kennesaw Family Physicians and apparently treated the claimant. Unfortunately, the record fails to indicate the attending doctor for each date of service.

**16.** The claimant reported that his mother had been murdered when he was five years old; he had been raised by his maternal grandparents and had been shuffled from one family to another; and his father had died eleven years ago.

was anxious; but he was motivated to get better. Tr. 372–374.

When the claimant returned to Dr. Boyd on July 30, 1997, he complained that he was still being harassed at work; and he was feeling overwhelmed, depressed and frustrated: his supervisor had allegedly gone through his desk, accessed his computer, and forged his signature on a document. Tr. 371. The claimant returned on August 4, 1997, and talked at length about his job and alleged job discrimination. Dr. Boyd diagnosed him as suffering from depression, with heightened anxiety. Tr. 369. She noted that he was exhausted, and made only fair eye contact when he returned on August 11, 1997.

On August 15, 1997, Dr. Boyd diagnosed the claimant as being disabled from work due to severe depression and heightened anxiety caused by his work-related problems, which also impacted his family. She estimated that he would be able to return to work in three months. Tr. 367 The claimant saw Dr. Boyd on a weekly basis until October 2, 1997. At that time he was still depressed but calm. He was also less depressed on his next visit; but, on October 14, 1997, he felt hopeless about his career. Tr. 365–366. Dr. Boyd recommended to the claimant's employer, that it change the claimant's work location and allow him to work only half days for the first two weeks after he returned to work. Dr. Boyd also opined that the claimant's depression was primarily work-related; and she hoped that these added measures would help him with his adjustment back

to work. Tr. 364. The record is devoid of any further treatment by Dr. Boyd.[17]

9. *Dr. Jeffrey Klopper, M.D./Dr. George Rowe, M.D. Atlanta Psychiatry and Neurology*

Psychiatrist Dr. Jeffrey H. Klopper, M.D. and Dr. George Rowe, M.D. at Atlanta Psychiatry and Neurology,[18] treated the claimant from September 9, 1997 to May 21, 1999. Tr. 287–300. In September 1997, the claimant was having sleeping problems for which his physician prescribed Doxepin. On July 24, 1998, the claimant returned reporting that he was overwhelmed; he appeared to be obsessed with his situation at work, and this was interfering with his day-to-day functioning. He was also concerned that he might act out impulsively, and continued to have trouble sleeping. Tr. 300.

On August 3, 1998, the claimant reported that he had lost control at work the prior Wednesday and had called in sick since then; he felt tired, and he was afraid that he would hurt someone, although he had no such plans to do so. Dr. Klopper started the claimant on Buspar for his panic attacks. The claimant was interviewing for another job, and said he was also about to start his own business.[19] Tr. 299. On September 1, 1998, Dr. Klopper observed that the claimant was still focused on the harassment and discrimination he was allegedly suffering at work; he was still having trouble sleeping; and he was still looking for a new job. Dr. Klopper also observed that the claimant was visibly trembling. Tr. 298.

**17.** Although, as shown *infra,* the claimant continued to see Dr. Boyd for some additional time in 1998.

**18.** The agency's letter requesting medical records is directed to Dr. Klopper and Dr. Rowe at the same address, which is the address for the Atlanta Psychiatry and Neurology practice. Unfortunately, the treatment notes from

Atlanta Psychiatry do not reflect the name of the treating physician. The claimant indicates that Dr. Klopper prescribed his medication.

**19.** The record indicates that the claimant owned rental property at one time; he no longer has that property.

On September 8, 1998 the claimant reported that he was interviewing for a district manager position with an oil company; and, on September 30, 1998, he reported that he was doing well with his job hunt, but he felt tired, weak, and anxious, was concerned that his medication was slowing him down. Tr. 298. One month later, on October 30, 1998, the claimant reported that he was becoming increasingly depressed in his search for a new job; and he still felt that he would injure someone if he had to return to AT & T.

On November 27, 1998, the claimant reported that he was receiving disability benefits from AT & T, but he was still going to sue AT & T for discrimination. He complained that his memory was not good, and he was having to make notes to himself. At his next monthly visit, on December 24, 1998, he was more depressed; he was still having memory problems and difficulty with concentration; he had been unable to obtain a government job; and he did not want to return to his employer. Shortly thereafter, the claimant was accepted for a doctorate program through Walden University's correspondence school; and in January and February 1999 he reported that he was less depressed.

However, on March 1,1999, the claimant was feeling more depressed and anxious, after AT & T allegedly told him he could not continue on disability benefits and that he had to return to work. The claimant started seeing the doctor for weekly visits. Tr. 292. On March 28,1999, AT & T terminated the claimant; and, the medical evidence of record shows that he continued to see Drs. Klopper and Rowe in April and May, 1999, and that he was suffering with heightened depression and anxiety; he could not sleep; and he was focused on suing his employer for employment discrimination.[20] The record is devoid of any additional treatment records from Drs. Klopper or Rowe, after May 21, 1999.[21]

### 10. Dr. Stanley M. Fineman, M.D.

The claimant had sinus surgery in 1987; and, in 1991, Dr. Stanley M. Fineman, M.D., at the Atlanta Allergy and Asthma Clinic, started treating the claimant for continued allergy and sinus problems. Tr. 216–233. On January 1, 1998, Dr. Fineman opined that the claimant demonstrated significant sensitivity to dust mites, irritants, fumes, odors, chemicals and smoke, and needed to avoid exposure to all such irritants.

### 11. Dr. Mark Kassels, M.D.

Dr. Mark Kassels, M.D. examined the claimant's vision on April 10, 1998. Tr. 241. On October 8, 1998, Dr. Kassels diagnosed the claimant as having glaucoma at age forty. Tr. 238.

### 12. Crawford Long Hospital

On September 10, 1998, the claimant sought treatment at Crawford Long Hospital for back pain; and Dr. Shubhaug Mazumdar, M.D. ordered shoulder, cervical, lumbar, and chest x-rays. Those x-rays showed no evidence of bony or soft tissue abnormalities in the claimant's shoulder; his chest was also normal; his lumbar spine showed no fracture or compression; and there was no motion at the

---

**20.** The claimant filed employment discrimination claims against AT & T. He ultimately filed those claims, in two separate actions, in this District Court: *Rease v. AT & T Corporation,* —— F.Supp.2d —— (NDGa., Civil Case No. 1:98–CV–02659–CC–JMF, September 30, 2005); *Rease v. AT & T Corp., et al,* —— F.Supp.2d —— (NDGa., Civil Case No. 1:02– CV–02536–CC–JMF, May 1, 2003), affirmed on appeal, 88 Fed.Appx. 387 (11th Cir. 2003)(No. 03–12621) (Issued as Mandate February 13, 2004).

**21.** Although, as shown *infra,* the claimant apparently continued to see Drs. Klopper and Rowe until some time in 2000.

site of his cervical fusion, and his cervical disc spaces appeared otherwise well preserved. Tr. 235–236.

### 13. Dr. Felicia Pierre, D.P.M. Smyrna Clinic

Dr. Felicia Pierre, D.P.M. treated the claimant on July 13, 1998 for bilateral arch pain for three years duration. The claimant reported that the pain was worse when he first got up in the morning and after sitting for extended periods of time; specifically, it was a dull, aching pain; and his arch supports did not provide any relief. Dr. Pierre diagnosed the claimant as suffering from severe plantar fasciitis, bilaterally, and flat feet; and she prescribed stretching, icing and strapping his arches. Tr. 434.–5. The claimant returned on July 20, 1998, and reported that he had experienced some relief. X-rays taken at that time showed significant medial column collapse in both feet but no pathological fractures, bony erosions or cortical breaks. At the claimant's request, Dr. Pierre took casts of the claimant's feet to make him permanent arch supports. Tr. 431.

### 14. Dr. Alan Maloon Marietta Neurological Associates

On April 28, 1999, the claimant saw Dr. Alan Maloon, M.D. at Marietta Neurological Associates, for a neurological consultation.[22] Dr. Maloon noted that the claimant had been suffering from neck pain for more than 20 years, beginning when he was on active military duty at which time someone hit him from the back when he was jumping out of a helicopter. The claimant gave a history of being fine after that, until he was struck from the rear in a motor vehicle accident in 1990. He subsequently had cervical surgery, but he was still having intrascapular pain radiating up into his neck, and also having low back and hip pain. The claimant also gave a history of depression and panic attacks. He was on Doxepin, Lorazepam, Wellbutrin, and BuSpar, plus allergy and glaucoma medication. Tr. 285–286.

Dr. Maloon recommended that the claimant undergo a new MRI of his cervical spine, and also obtain EMG/nerve conduction studies of both upper extremities so as to ascertain whether the claimant was having any cervical radiculopathy. Dr. Maloon put the claimant on Neurontin 100 mg. Although the claimant's insurance company denied coverage for the MRI, Dr. Maloon administered the nerve conduction study on May 13, 1999, which was unremarkable. The claimant continued to complain that he was suffering from significant pain, and that the 100 mg. Neurontin had not given him any relief. Dr. Maloon increased the claimant's dosage of Neurontin to 300 mg.; and referred him to Kennestone Hospital for physical therapy. The claimant was to return in six weeks to discuss whether Dr. Maloon should refer him to an anesthesiologist for an epidural block. Tr. 283–286. The claimant's insurance company subsequently approved coverage for him to have a new MRI which was administered by Dr. Maloon on June 25, 1999. The MRI showed that the claimant had osteophytes causing small impressions on the thecal sac in the area of the claimant's cervical fusion. The record is devoid of any evidence that the claimant returned for further treatment with Dr. Maloon.

### 15. Dr. Barry N. Straus, M.D. NGPC— Pain Medicine Specialists

On August 11, 1999, Dr. Barry N. Straus, M.D., a pain medicine specialist, treated the claimant for complaints of neck and low back pain. The claimant reported that his neck pain radiated into his upper right shoulder and down his right arm, with some parethesias in his fingers and

---

**22.** Dr. S.J. Rosenbloom, M.D. made the referral for the neurological consultation.

shoulder. He also complained that he suffered from low back problems: his back would "lock up," and he would have to go to the ER for relief;[23] his pain was worse if he was bending, doing yard work or sitting; it was better if he could change positions; and he was still having trouble sleeping because of his pain.

The claimant told Dr. Straus that an MRI had shown that he had a bulging disc at C5–6 and C6–7, as well as at T1–2.[24] On examination, Dr. Straus found that the claimant had a normal range of motion in his right shoulder; some pain with range of motion in his left shoulder; and a positive trigger point in his left levator scapula. His muscle strength was 5/5; and his exam was negative for Tinel and Phalan responses.

Dr. Straus administered a cervical epidural steroid injection at C5–6, on August 11, 1999. Tr. 330–331. The claimant returned on August 20, 1999, and reported that the epidural injection had helped markedly. Accordingly, Dr. Straus administered a cervical epidural injection at C6–7. The record is devoid of any further treatment by Dr. Straus. Tr. 329.

### 16. Dr. Richard J. Stork, M.D. Pain Consultants of Atlanta, LLC

On March 10, 2000, seven months after the claimant saw Dr. Straus, Dr. Richard J. Stork, M.D. of the Pain Consultants of Atlanta had the claimant admitted at Piedmont Hospital for pain management services. Dr. Stork examined the claimant's range of motion and found that the claimant had full forward flexion; his neck extension was reduced to 20 degrees; he could turn his head 75 degrees to the right, but only 15 degrees to the left; bending to both sides was restricted; and the claimant had muscle spasms in his left trapezius. Dr. Stork diagnosed the claimant as suffering from degenerative disc disease of the cervical spine, with possible facet degeneration, and myofascial pain syndrome. Tr. 484–486. As the claimant reported a "poor response" to previous epidural steroid injections, Dr. Stork prescribed muscle relaxants, anti-inflammatants and physical therapy every other day for two weeks. The claimant also agreed for Dr. Stork to give him a trigger point injection in his left trapezius. Dr. Stork recommended delaying any evaluation of the claimant's low back problems, until his neck problems were under better control. Tr. 486–487.

On March 27, 2000, after giving the claimant two weeks of therapy, Dr. Stork re-evaluated the claimant and diagnosed him as suffering from degenerative disk disease of the cervical spine, myofascial pain syndrome, and possible degenerative disk disease of the lumbosacral spine. The claimant's lumbosacral pain ranging from "3 to 10" on a scale of ten; and Dr. Stork observed that the claimant also had numbness in the distribution of the left L5 nerve root. Tr. 481–483.

The medical evidence of record is devoid of any treatment notes, from any treating or consulting source, between April 2000 and April 2002, except for Dr. Marrinson's consultative psychological evaluation in October 2000, when he found the claimant to be suffering from Major Depression secondary to chronic physical problems.[25]

---

**23.** This Court infers that the claimant is referring to his visits to the Kennesaw ER.

**24.** See Dr. Mulick's myelogram and CT scan results of the claimant at Shallowford Community Hospital in 1991, and the May 1999 EMG and nerve conduction studies at Marietta Neurological Association. See also the June 1999 MRI administered by Bonnie Anderson at Kennesaw Hospital.

**25.** Of note, the claimant testified at his second hearing that he had been able to travel to three seminars, in different cities, through 2001, in the course of working on his doctorate degree. Tr. 724–725.

The claimant returned to Dr. Stork on May 24, 2002, at which time Dr. Stork performed physical, neurological and sensory examinations; and he diagnosed the claimant with cervical degenerative disk disease and myofascial pain syndrome, and ordered a new cervical MRI (Tr. 442). On May 31, 2002, the claimant returned to Dr. Stork and complained that he was suffering from pain that was 10/10, and 12–15/10 at the worst. Dr. Stork noted that this indicated a significant emotional component to the claimant's discomfort; and, in fact, the claimant also complained that he was moderately depressed. Tr. 473–474.

On June 6, 2002, the claimant reported that his pain had improved and was 4/10, or 7/10 at the worst. Dr. Stork noted that the claimant's earlier MRI had shown early degenerative disk disease in his mid lower lumbar area and a probable herniation at L5–S1. Dr. Stork administered an epidural steroid injection at L5–S1. Tr. 479. On July 11, 2002, the claimant returned, and Dr. Stork advised him that the new cervical MRI that was taken on June 20, 2002 showed no significant spinal stenosis such as would require surgery; and he administered a cervical epidural injection at C6–7. On August 11, 2002 the claimant reported that he felt a 50% reduction in his cervical pain for two weeks; and he still felt 25% better. Tr. 464. Dr. Stork prescribed Ultram 50 mg. (100/month) (a non-narcotic pain medication) and Zanaflex, 4 mg. To help control the claimant's pain.

The claimant missed his appointments in late August, and in September. He returned to Dr. Stork on October 2, 2002, at which time Dr. Stork administered an epidural injection at L5–S1. On October 17, 2002, the claimant returned and complained that the pain medication (Ultram and Zanaflex) had not provided him with

any relief; he was waking up in severe pain with spasms in the middle of the night; he was in the most severe pain in the mornings; he had recently been placed on a new anti-depressant (but could not recall the name of the medication). Dr. Stork examined the claimant and found that 17 out of 18 pressure points were positive; and he, therefore, diagnosed the claimant as suffering from fibromyalgia. He prescribed anti-inflammatories, and physical therapy; and asked the claimant to call the Pain Clinic with the name of his anti-depressant as some were better for fibromyalgia than others. (Tr. 438–442).

### 17. Piedmont Medical Center

When the claimant started therapy at the Piedmont Pain Clinic on May 24, 2002, he reported that changing positions did not decrease his pain; his pain was as high as 12–15 on a scale of 0–10; his pain was worse at night; and he was moderately depressed. Tr. 493–494, 500–501. On May 31, 2002, the claimant complained of upper back pain on the left side, which he rated as 7/10 (Tr. 499, 491). On July 11, 2002, he rated his upper and lower back pain as 4/10; and Dr. Stork administered a cervical epidural steroid injection, as already noted above; and, on August 1, 2002, the claimant reported that his pain had improved to 3/10, and, at best, 2/10. (Tr. 498, 489). In subsequent visits on August 29, September 9, and October 17, 2002, he reported that his back pain and leg pain were 4/10. (Tr. 436–437, 490, 495–496, 488). The record is devoid of any further treatment at Piedmont Medical Center.[26]

### Consulting Mental Health Physicians

### 18. Dr. Steven Marrinson, Ph.D., P.C.

On October 19 and 24, 2000, psychologist, Dr. Steven Marrinson, Ph.D., admin-

---

26. The claimant began an aquatic therapy program at Kennesaw Hospital, after Dr. Stork's October 17, 2002 diagnosis that the claimant was suffering from fibromyalgia.

istered a battery of psychological tests to the claimant, including a Psychiatric Review Technique Form (PRTF) that he signed on October 23, 2000, and a "Supplemental Questionnaire as to Residual Functional Capacity" that he signed on October 24, 2000. Dr. Marrinson also administered the MMPI–2 (the Minnesota Multi-phasic Personality Inventory), a test of adult psycho pathology, consisting of 400 questions. Most people can complete the MMPI–2 in an hour and a half; the claimant took almost three hours to complete such test. Tr. 349, 351. His MMPI–2 Validity Scales suggested to Dr. Marrinson that the claimant might have exaggerated his psychiatric symptoms; but Dr. Marrinson administered the Rorschach Inkblot test which "is very difficult to fake," and found that the claimant's Rorschach results were consistent with his MMPI–2 results (i.e., both tests showed the same clinical results)[27] (Tr. 349).

Dr. Marrinson also found that the claimant's MMPI–2 and Rorschach test results were consistent with the claimant's complaints during his interview and his answers on The Daily Living Questionnaire (which he was not able to finish). The claimant reported that he had difficulty focusing to read and write, and, as a result, he was taking much longer to complete tasks. Tr. 350. He also had memory problems; as evidenced when he forgot that he had left food cooking on the stove, and had forgotten to meet his children when they got off the school bus. Dr. Marrinson found that the claimant's complaints were consistent with his difficulties completing the MMPI–2 and the The Daily

Living Questionnaire. Dr. Marrinson also observed that the claimant had to frequently shift his position; and he got in and out of his chair, and held his back with his hand as if to provide it with more support. Tr. 351.

Dr. Marrinson diagnosed the claimant as meeting and equaling a listed impairment under Appendix 1 for major depression (an Affective Disorder, § 12.04), characterized by: appetite disturbance, sleep disturbance, decreased energy, feelings of guilt and worthlessness, difficulty concentrating, suicidal thoughts, and possible paranoid thinking. Tr. 354. Dr. Marrinson also concluded that the claimant's impairments had resulted in a marked restriction of his (1) activities of daily living; and (2) social functioning; and (3) his concentration, persistence or pace (i.e. his ability to complete tasks in a timely manner). Tr. 358.

In a "Supplemental Questionnaire as to Residual Functional Capacity," administered on October 24, 2000, Dr. Marrinson concluded that the claimant was:

(1) moderately impaired in

 (a) his ability to relate to others; and

 (b) his ability to respond appropriately to supervision. And

(2) had "moderately severe" restrictions in

 (a) in his daily activities;

 (b) the degree of constriction of his interests;

 (c) his ability to understand, carry out and remember instruction;

 (d) his ability to respond appropriately to co-workers; and

---

**27.** This Court infers from this that Dr. Marrinson concluded that the claimant was not exaggerating his psychiatric symptoms on the MMPI–2.

 Dr. Marrinson also noted that the claimant's MMPI–2 showed "no movement responses, even on items wherein movement is almost always seen"; form level deterioration, relative to the claimant's above average vocabulary, suggesting average to bright average intelligence; and repeated, almost perseverating references to dark clouds and dreary colors. Tr. 349. He attached the claimant's MMPI–2 score sheet to his report (i.e., to the PRTF that he signed on October 23, 2000).

(e) his ability to maintain attention/concentration. And

(3) had severe impairments regarding his ability to

(a) respond to customary work pressures;

(b) perform simple tasks;

(c) perform complex tasks;

(d) perform repetitive tasks; and

(e) perform varied tasks. Tr. 359–360.

In Dr. Marrinson's opinion, the claimant's allegations of pain were credible and consistent with the clinical psychological findings, and the claimant's pain so interfered with his concentration that he was severely limited in his ability to sustain any job performance over time. Dr. Marrinson further concluded that the claimant's physical pain and his depression were mutually reinforcing medical problems, that, in combination, constituted a severe impairment. Tr. 360.

### 19. *Dr. David B. Rush, Ph.D.*

On September 10, 2002, after the Appeals Council remanded the claimant's case to the ALJ for a new hearing, the claimant saw Dr. David B. Rush, Ph.D., for a new psychological evaluation. Dr. Rush interviewed the claimant; and his psychometrist, Dr. Diana Gordick, Ph.D., administered a battery of psychological tests including a Mental Status Examination, Wide Range Achievement Test—Revision 3 (WRAT–3), and Wechsler Adult Intelligence Scale—Third Edition (WAIS–III).[28] Tr. 424. Dr. Rush also reviewed the claimant's medical records from Drs. Boyd, Klopper and Rowe; but he, apparently, did not review Dr. Marrinson's consultative report from October 2000.

At that time, the claimant reported that he had been suicidal when he applied for Social Security benefits three years earlier, but denied any current intention to injure himself. Tr. 424, 426. He was on (an unspecified) pain medication, four times daily; he had an epidural injection one month previously; he was taking sleeping pills and Zyrtec, and he used nose spray twice daily.[29] Tr. 425.

The claimant told Dr. Rush that his typical day included getting his children ready for school, and then dealing with various household tasks (he would clean the house, prepare meals, wash dishes, and do laundry). Dr. Rush noted that the claimant could also use a telephone; drive himself; and manage his own budget; and he was working on getting a doctorate degree, and personally handling his legal and insurance issues.[30] When he had trouble remembering things, the claimant would write them down.

Dr. Rush found that the claimant demonstrated the ability to follow three stage commands, carry out detailed instructions, initiate tasks, and complete a task in a reasonable time period. Dr. Rush also observed that the claimant had arrived for his evaluation an hour and 15 minutes late;[31] he leaned to one side while standing, and held himself to one side when sitting; and the claimant's affect was

---

**28.** At a later point in his report, Dr. Rush also mentions that the claimant took the Bender–Gestalt test and made no errors, based on the Hutt and Briskin scoring system.

**29.** The claimant was also on an anti-depressant, although this was not noted in Dr. Rush's Report. See Tr. 531, Claimant's letter of 12/24/02 to the Office of Hearings and Appeals.

**30.** Dr. Rush did not specify what insurance issues; apparently, he was referring to the claimant's efforts to be found eligible for Social Security Disability Insurance.

**31.** Although in an attached medical assessment form, he indicates that the claimant arrived ten minutes early.

somewhat limited. The claimant appeared to be calm, but irritable; and he repeatedly expressed frustration over discrimination that he allegedly suffered while serving in the army, working at AT & T, and socially.

Dr. Rush had difficulty getting the claimant to give him clear answers regarding dates, duration and his symptomology. The claimant acknowledged symptoms of obsessive-compulsive disorder, but supplied little in the way of accurate examples of his symptoms. He felt that he had improved; and he was able to complete timed intelligence tests in adequate time. Dr. Rush opined that the claimant's attention and concentration were within normal limits. He found that the claimant exhibited consistent effort; worked persistently; was surprised that some questions were difficult; and tried to guess on questions where he did not know the answer. Nonetheless, Dr. Rush thought the claimant had not extended his full effort on memory questions. Tr. 425–426. According to Dr. Rush, the claimant's full scale IQ was 90; his verbal IQ was 95, and his performance IQ was 84.

Utilizing the DSM–IV, Dr. Rush diagnosed the claimant with: an Axis I of a Cognitive Disorder NOS (294.9) and an Obsessive–Compulsive Disorder (300.3); no Axis II diagnosis; and an Axis III of History of Spinal Injury and Degenerative Disc Disease (per patient report). Tr. 427. Dr. Rush opined that, without regard to any of the claimant's physical limitations, he was otherwise able to work forty hours per week in a competitive environment. Tr. 427.

*Non Examining Physician*

20. *Dr. Robert Willingham, Jr., M.D.*

Dr. Robert Willingham, Jr., M.D., a non examining, agency, orthopedic consultant, reviewed the claimant's medical records and completed a Medical Consultant's Case Analysis on June 24, 1999. He found that the claimant had undergone a cervical fusion at C3–4 and C4–5, and suffered from continued chronic low back pain, with no lumbar fracture or subluxation identified.[32] He found no evidence of any significant motor, sensory or reflex deficits. Tr. 301–302.

Dr. Willingham also completed a Residual Functional Capacity Assessment, on June 22, 1999; and concluded that, based on a primary diagnosis of low back pain and secondary diagnosis of an anterior cervical fusion at C3–4 to C4–5, the claimant could: lift or carry 50 pounds; frequently lift or carry 25 pounds; stand or walk approximately 6 hours; and sit for 6 hours, with normal breaks; and had, *inter alia*, an unlimited ability to push and pull; no postural limitations, and no environmental limitations other than to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation (minimal allergic). Tr. 332–347.

On September 10, 1999, Dr. Willingham completed a second Physical Residual Functional Capacity Assessment; and concluded that the claimant's primary diagnosis was post cervical fusion, and his secondary diagnosis was low back pain, with the same restrictions or limitations as he noted earlier, with one change: the claim-

---

**32.** Dr. Willingham did not identify the specific medical records on which he based his findings. The record shows that in 1999, Dr. Samuel Bone, M.D. took x-rays at the Kennesaw ER and saw no sign of subluxation.

However, the claimant's earlier medical records from his chiropractor, Dr. Logan, showed that Dr. Logan did diagnose him as

having subluxation at L–5 in 1989. Dr. Willingham makes no mention of Dr. Logan's records; and he also fails to mention Dr. Mulick's lumbar CAT scan and myelogram in 1991, which showed that the claimant had a mild disc herniation at L5–S1, with mild impingement on the S1 nerve root, and a mild to moderate disc bulge at L4–5.

ant did not have an environmental limitation due to allergies. Tr. 332–339.

## B. *THE SUBJECTIVE MEDICAL TESTIMONY*

### 1. *The October 26, 2000 de novo Hearing*

At his first *de novo* hearing, where he was represented by counsel, the claimant testified that he had been injured while serving in the military 23 years previously; and his injuries were exacerbated by an automobile accident in 1990. He had undergone a cervical fusion in 1991. In 1997, he went on a disability leave of absence from his job because of severe depression and anxiety when AT & T allegedly would not accommodate his physical limitations; and on March 28, 1999, AT & T had terminated him while he was still out on disability leave, and his disability benefits had ceased. Tr. 679–680. The claimant's wife's income supported their household and their three children (ages 12, 10 and 8 at that time). Tr. 687.

The claimant testified that he was never pain free, and had constant spasms. He had tried numerous pain medications, and trigger point injections. He was trying to use only over-the-counter medication for pain; and, when the pain became unbearable, he would get an epidural injection. Most recently, he had a lumbar epidural steroid lumbar injection two weeks before the hearing, and a cervical epidural steroid injection three or four months before that. Tr. 697, 680–681. The claimant did therapy on his own, because he could no longer afford to go to therapy. Tr. 685–686. He had to do stretching exercises before he could get out of bed; some days he could not get up; and other days he had to go back to bed; and he was depressed. Tr. 684–5.

The claimant's daily activities, to the extent he was able to do them, included making his children's school lunches; get-ting them off to school; and going to a gym to do his therapy exercises. Specifically, he would do stretching and back strengthening exercises; and he used a heated pool and the whirlpool. When his children got home from school, he would help them with homework; and he tried to do what he could to help with laundry and cooking; and he also looked for jobs each day, online. Tr. 681–682; 691–692. The claimant also testified that he still helped with mowing the yard, albeit one small section at a time over the course of a week, with help from his family. Tr. 684. He could no longer bowl, play golf, or even sit through a movie. Tr. 682–683. He was still working on the doctorate degree that he started in 1998; but he had trouble focusing and was taking nine months to one year to complete an assignment, compared to other students who took only a month or two to complete the assignment. Tr. 696, 699–700. The claimant also complained that he had memory problems, and had forgotten that he had food cooking on the stove, and also forgot to meet his children at the school bus stop. Tr. 681–684.

The claimant had driven himself to the hearing, while suffering a great deal of pain; and he testified that he did not drive, except to go to his therapy at the gym or to pick up groceries (which his wife and children would help him bring into the house). He had also driven to a family reunion in Cincinnati, by sharing the driving with his wife and her sister, and taking frequent stops. Tr. 681, 700.

When he was working for AT & T, the claimant had conflicts with his supervisors because they allegedly did not attempt to accommodate the work restrictions imposed by his doctors. As a result of this conflict he became severely depressed and anxious; and his psychiatrist, Dr. Klopper, had ordered that he take a disability leave

of absence. The claimant felt that he could have continued to work at his regular job, if AT & T had accommodated his need to change his work position and take breaks. Tr. 689. Since his termination, he had obtained a job at a Sheraton Hotel as a front desk clerk; but he quit after a month and a half, because the job required him to stand constantly, which exceeded his capacity. Tr. 680. He felt that he was unable to work, but he had no choice, as he has a family to support; and, therefore, he was looking for an auditing or administrative job that might accommodate his restrictions. Tr. 691.

### 2. The April 23, 2003 de novo Hearing

At his second *de novo* hearing, the claimant elected to proceed *pro se.* He had reviewed his Social Security file immediately preceding the hearing; and he did not think that his medical file portion of the record was complete: he thought that some of his medical records from Drs. Boyd, Rowe and Klopper were missing (Tr. 709), and that the medical records on his treatment for chronic myofascial pain syndrome and fibromyalgia were also not in his file. He was also upset because had forgotten to bring his medications with him; and he had requested, but never received, a copy of Dr. Rush's report, although immediately before the hearing, he had been given the opportunity to read a copy thereof contained in his file; and he wanted the ALJ to give him the opportunity to respond to Dr. Rush's report after the hearing. Tr. 710.

The ALJ reminded the claimant that, as the claimant, he was responsible for submitting his medical records, and almost a year had passed during which time he could have done so;[33] and he could also have reviewed his records earlier. The ALJ advised the claimant that, nonetheless, he could have 30 days to submit any additional records that were still outstanding, particularly anything from 2002–2003, or any records from Drs. Boyd, Klopper or Rowe that were missing. He also advised the claimant that he (the ALJ) could subpoena medical records for the claimant, if the claimant's efforts to obtain them were unsuccessful. Tr. 711–712, 715–716, 722.

The ALJ also pointed out that he and the other experts who were present for the hearing (Dr. Suzanne Cullins, M.D.; Dr. Neal Lewis, Ph.D.; and Dr. Laura Sewell, Ph.D., the vocational expert) likewise had not had the opportunity to review any new (non-duplicative) medical evidence that the claimant had brought to the hearing. These experts would have to review any such new medical evidence; and, if necessary, provide the ALJ with a supplementary report. In response to the claimant's request for an additional hearing so that he could cross-examine these experts after they reviewed his additional medical evidence. The ALJ initially said that he would not schedule an additional hearing, but then later said that he would withhold judgment as to whether he would schedule another hearing, and his decision would depend on the medical records that the claimant submitted. Tr. 713–714; 738.[34]

33. The record shows that the claimant had, in fact, sent additional medical records, to the Office of Hearings and Appeals, on August 18, 2002 and December 24, 2002, while his claim was pending before the ALJ on remand. Tr. 529, 531.

34. The claimant objected to the testimony from the three expert witnesses at the second *de novo* hearing, on the basis that the SSA had not advised him in advance that they would be present. Thus, he was not prepared to prepare cross-examine them. Tr. 739.

The claimant also contends that the ALJ created a "conflict of interest," as the claimant would be deprived of his right to cross-examine the medical witnesses after they reviewed his additional medical information, if the ALJ refused to schedule another hearing. Indeed, in the event that the ALJ submitted additional medical evidence to the experts, he had the obligation to notify the claimant

The claimant testified that he remained unemployed; and his wife's work continued to be the family's sole source of income; and the claimant contributed to the household by helping with the children (ages 15, 13 and 11); he was also undergoing therapy at the gym, and was still trying to finish his dissertation for a Ph.D. in business administration. He had also been able to travel to seminars in three different cities, in connection with his Ph.D. program, in 2001 or earlier. Tr. 723, 724–727.

The claimant also stood up and changed his position during the hearing. The ALJ asked the claimant to explain why he was unable to work; and the claimant responded that he was not contending that he was unable to work at all. Tr. 727. Rather, each time he went on a job interview and the prospective employer learned that AT & T terminated him, it created a problem.[35] He had continued to send out resumes for entry level management positions; but had been unsuccessful in obtaining new employment. Tr. 728–729. He felt that he could work, in some way, if his impairments were accommodated (i.e., his employer would let him move around or lay down, as needed, as he could at home). Tr. 730–731. He was suffering from extreme fatigue from his myofascial pain syndrome, and would sometimes collapse on the floor. Tr. 731–732. He had forgotten to bring his medication to the hearing, and could not pronounce its name; and he not use his medication all the time, because it would lose its effectiveness. The claimant's testimo-

ny terminated when the ALJ announced that the time for the hearing had expired, and he needed to question the experts who were present. Tr. 734.

## C. *THE CLAIMANT'S AGE, EDUCATION AND EMPLOYMENT HISTORY*

The claimant was born on January 28, 1958, and was approximately forty years old at the time of the alleged onset of his disability (August 6, 1998). Tr. 97. The claimant was 42 years old at his first (October 2000) hearing, and 45 years old at the time of his second (April 2003) hearing, and had not been employed since 1999. Tr. 34.

The claimant completed high school; and earned an associate degree in computer programming from Southern Ohio College in Cincinnati, a bachelors degree in business administration from Shorta College, a masters degree in organizational management from the University of Phoenix, and a doctorate in business administration from Walden University.[36] Tr. 696.

The claimant's past relevant work includes 16 years of employment at AT & T: during his last two years he worked in the financial operations section (e.g., with missing bills investigation, and auditing); prior thereto he worked on service contracts as a salesman for pay telephones; and prior thereto he worked on service contracts and leases in the real estate and purchasing department. In connection with his job, he was also trained in real estate appraising. Tr. 678–679, 687, 701.

---

thereof; and, at the very least, to tell the claimant that he could submit questions to the experts based on their reports.

**35.** The claimant testified that his employment discrimination case had been filed in this district court, and he was still engaged in settlement negotiations with AT & T. Tr. 733–734.

**36.** See *Rease v. Harvey et al,* —— F.Supp.2d —— (NDGa., Civil Docket No. 1:05–CV–02287–CC, September 1, 2005) at Doc. 1, p. 2, wherein the claimant advises that he completed his doctorate program. The claimant apparently started working on his doctorate in January 1998, and completed his degree sometime between April 2003 and August 2005.

At the time of his termination, the claimant was also working on forming his own rental property investment company; however, he had been unable to hold onto his real estate holdings.

### D. TESTIMONY OF THE VOCATIONAL EXPERT

#### 1. The VE's Testimony at the First Hearing on October 26, 2000

Mr. Earl Thompson testified as the ALJ's vocational expert (VE) at the claimant's first de novo hearing, on October 26, 2000. Tr. 701. The VE classified the claimant's prior work for one and a half months as a hotel clerk in 1999, as light, semiskilled work (SVP 4; DOT code 238.367–038). Tr. 702. He classified the claimant's prior work as a financial clerk with AT & T as sedentary, semiskilled work (SVP 5; DOT code 216.482.010); the VE further classified that work, as the claimant performed it, as an auditing clerk, as a sedentary, skilled position (SVP 7; DOT code 210.382–010). Tr. 702. The VE classified the claimant's previous work in the AT & T real estate and purchasing department (as a leasing agent for commercial property) as light, semiskilled work (SVP 5, DOT code 250.357–014). Tr. 703.

The ALJ then asked the VE several hypothetical questions. He first asked the VE to assume someone with the claimant's age, education and work experience, who had the physical restrictions identified by Dr. Robert Willingham, Jr., M.D. (the agency's non examining orthopedic consultant) and a non severe mental impairment. He then asked the VE whether such a person could perform any of the claimant's past relevant work. The VE responded that such a person could perform all of the claimant's past relevant work, which involved a medium level of exertion (lifting up to 50 lbs.), as the claimant's psychological issues, as framed, were not "a factor" in the hypothetical posed by the ALJ.

Regrettably for the claimant, his attorney did not object to the VE's testimony and did not ask if his opinion would be the same if the claimant's mental impairment was severe. However, he asked the ALJ to keep the record open so that he could submit a residual functional capacity report from a Dr. J.J. Shaw who had seen the claimant on October 20, 2000. The record is, however, devoid of any report from Dr. Shaw; and this Court, therefore, infers that the claimant's attorney, or the claimant who subsequently proceeded pro se, failed to obtain or submit any such report.

#### 2. The VE's Testimony at the Second De Novo Hearing on April 23, 2003

At the claimant's second hearing, Dr. Laura Sewell, Ph.D. testified as the ALJ's vocational expert. Tr. 743–745. Ms. Sewell testified that the claimant had worked as a reports clerk, compiling data, verifying the accuracy of data and producing reports for AT & T from 1983–1998; and such work most closely matched DOT Code 216.382.062; and she classified that work as a sedentary, semiskilled position.

The ALJ asked the VE whether a person with the claimant's non-physical limitations, as identified by Dr. Lewis or Dr. Rush, would be able to perform the claimant's past relevant work as a reports clerk. Dr. Sewell testified that the claimant's past relevant work as a reports clerk is semi-skilled work that generally does not require the employee to deal with the public, but does require the employee to interact with co-workers; and, as Dr. Rush had found that the claimant would have difficulty dealing with coworkers, Dr. Sewell opined that a person with the mental limitations identified by Dr. Rush (or Dr. Lewis, at the hearing) would not be able to do

the claimant's past relevant work as a reports clerk.

The ALJ then asked the VE a second hypothetical: whether there was any other work that a person with those limitations would be able to do. The VE testified that there were a wide variety of unskilled work that did not require significant interaction with co-workers and the public, including: (1) an assembler of small parts (DOT code 713.687–018), with approximately 1,360 jobs at the sedentary level in the Atlanta area, and 90,000 jobs in the national economy; (2) a person grading and sorting items (DOT code 712.687–108), with fifty jobs in the Atlanta area at the sedentary level, and 4,800 such jobs in the national economy; (3) a production inspector (DOT code 585.665.010), with 160 such positions in the Atlanta area, and 4,700 nationally; (4) a hand packer, packing items into small boxes (DOT code 920.687–03) with 100 such jobs at the sedentary level in the Atlanta area, and 5,300 nationwide; and (5) an information clerk (DOT 238.367–034) with 250 such sedentary, unskilled jobs in the Atlanta area, and 9,000 jobs nationally.

The claimant chose not to question the VE about her testimony.

*PART FIVE DISCUSSION*

A. *THE GENERAL RULE*

As noted above, the Commissioner's regulations require the ALJ to utilize a five-step sequential evaluation, which regulations also permit such a determination to be made at any one of the five sequential steps. 20 C.F.R. § 404.1520.

■ Once a claimant establishes that he cannot perform his past relevant work, he has met his initial burden, and the burden of going forward shifts to the Commissioner to show that the claimant is, nevertheless, capable of performing substantial gainful activity either at the claimant's exertional level, or at a lower level; and that such jobs exist in significant numbers in this region or in the national economy. *Hale v. Bowen,* 831 F.2d 1007 (11th Cir. 1987); *Gibson v. Heckler,* 762 F.2d 1516 (11th Cir.1985).

B. *THE ALJ'S CONCLUSION*

1. *The November 24, 2000 Decision*

After the claimant's first *de novo* hearing, the ALJ found that the claimant suffered from (1) post cervical fusion with lower back pain that is severe, but which was not severe enough to meet or medically equal one of the impairments listed in Appendix 1; and (2) depression and panic attacks that were non-severe. The ALJ also found that the claimant failed to present sufficient medical evidence to substantiate a listed impairment based on the claimant's alleged depression or panic attacks, as the medical evidence showed that the cause of those problems was the claimant's job at AT & T; he was no longer employed by AT & T; and he was no longer as angry about his work situation at AT & T.[37] Tr. 35–36.

The ALJ further found that the claimant (1) retained the residual functional capacity to perform work at the medium exertional level; and (2) could, therefore, perform any of his past relevant work (as a hotel clerk at the light exertional level;[38] a financial clerk at the sedentary exertional level; an auditing clerk at the sedentary exertional level; and a leasing agent at the light exertional level). As a consequence, he was not disabled. Tr. 38. In support of his decision, the ALJ relied on the VE's testimony at the October 26, 2000 hearing,

37. Although, as noted previously, at this time the claimant had filed employment discrimination charges against AT & T.

38. In all candor, this appears to be an unsuccessful work attempt, not a past relevant job.

that the claimant could return to all of his past relevant work, which was also confirmed by the 1999 non examining state agency medical expert, Dr. Willingham, who also found that the claimant was capable of work at the medium exertional level. Tr. 38.

The ALJ refused to give significant weight to the opinion of consulting psychologist Dr. Steven Marrinson, who diagnosed that the claimant as disabled by major depression secondary to chronic pain and physical problems. The ALJ's stated reason for refusing to give much weight to Dr. Marrinson's opinion was that, in the ALJ's opinion, Dr. Marrinson mentioned that the claimant might have exaggerated his symptoms. Tr. 37. The ALJ also noted that he had applied Social Security Ruling (SSR) 88–13 and 20 C.F.R. § 404.1529 regarding how the Social Security Administration views a claimant's pain allegations; and, while the claimant's allegations of a "severe" impairment, or combination of impairments, must be accepted as credible, the underlying inference that the claimant was totally disabled from all work activity as a result of such impairments must be rejected as not supported by the evidence of record. Tr. 38.

### 2. Remand by the Appeals Council

On June 18, 2002, on behalf of the Appeal Council, Acting Administrative Appeals Council Judge Everna McCray remanded the claimant's case to the ALJ for a new hearing. In the remand order, she directed the ALJ to: (1) address the claimant's 1999 earnings and whether the claimant had performed worked at the substantial gainful activity (SGA) level since his alleged date of disability onset; (2) properly evaluate the credibility of the claimant's subjective complaints according to the guidelines of SSR 96–7p (which supercedes SSR 88–13) and 20 C.F.R. § 404.1529; (3) obtain updated medical information from any treating sources and then consider all of the medical evidence of record and provide the rationale for the weight he assigned to each medical opinion and assessment; (4) discuss and explain the ALJ's rationale for his conclusions regarding the claimant's specific limitations and residual functional capacity, (5) consider obtaining one or more comprehensive mental status consultative examinations, and (6) conduct a new *de novo* hearing and obtain supplemental evidence from a VE to clarify the effect of the claimant's limitations on his ability to do his past relevant work or other work existing in significant numbers in the regional or national economies. She also directed the ALJ to take any further action needed to complete the claimant's administrative record and issue a new decision. Tr. 86.

The AC determined that, while the ALJ had emphasized that the claimant was looking for work and studying for his Ph. D., the ALJ (1) had done little to evaluate the regulatory factors relating to the claimant's credibility, or to provide his rationale in support of his determination that the claimant's allegations were not totally credible;[39] and (2) the ALJ failed to take into consideration the claimant's permanent restrictions as determined by Dr. Loftman, a treating physician, after the

---

**39.** The ALJ, however, paid special attention to a poorly documented issue of possible drug use when the claimant was in the military (he apparently was prescribed morphine, possibly in connection with his frostbite or other injuries, and his commander was unaware of his prescription and referred him for substance abuse). (Interview with Dr. David B. Rush, Ph.D., Tr. 425). There is no evidence of actual substance abuse then, and the agency's raising substance abuse issues is simply not relevant to the claimant's case: the ALJ, himself, recognized that there is absolutely no evidence or indication of any current drug involvement by the claimant.

claimant's cervical fusion in July 1991 (i.e., that the claimant was restricted from all cervical or lumbar bending, twisting, lifting, or torqueing; kneeling squatting, reaching overhead, pushing or pulling with the upper or lower extremities, and repetitive hand or foot motions; the claimant should not lift more than 20 pounds, and should not carry more than 15 pounds; and he cannot stand, sit, or walk for longer than two hours at a time without a break of 10 minutes). The ALJ had also failed to specifically address another treating physician's, Dr. Fineman's, medical opinion that the claimant had environmental restrictions: he should avoid exposure to dust mites, fumes, odors, chemicals and smoke, so as not to aggravate his respiratory symptoms.

The AC also observed that the claimant had been treated for depression in 1998 and 1999 by Drs. Klopper and Rowe, but neither they, nor the consulting psychologist, Dr. Marrinson, had conducted comprehensive mental status examinations; and the judge directed the ALJ to obtain one or more consultative examinations from mental health professionals.

### 3. *The April 23, 2003 Hearing on Remand*

At the second *de novo* hearing on April 23, 2003, the claimant elected to proceed *pro se,* after the ALJ again advised him of his right to be represented by legal counsel. The ALJ received testimony from the claimant, and, as previously mentioned, from three expert witnesses: Dr. Suzanne Cullins, M.D., who testified as the ALJ's medical expert; Dr. Neal Lewis, Ph.D., the ALJ's psychology expert; and Dr. Laura Sewell, Ph.D., the ALJ's vocational expert.[40] Tr. 515.

### *Dr. Suzanne Cullins, M.D.*

Dr. Suzanne Cullins, M.D., an internist, and the state agency medical adviser, testified that she had only reviewed the claimant's medical records through 1999, and she had not seen any medical records as to his diagnoses of fibromyalgia or myofascial pain syndrome; nor had she seen any records from the claimant's pain clinic treatment, other than the record of one cervical epidural injection; and she testified that she would need to review any new records on the claimant, particularly any records from 2000–2003. Tr. 735. Thus, any opinion she may have offered as to the claimant's disability is meaningless.

Dr. Cullins opined that, according to the claimant's medical records through 1999, he had (1) been involved in a helicopter accident, and suffered frostbite injuries to his feet, while he was in the military; (2) he was also involved in an automobile accident in 1990; (3) he had undergone a cervical fusion in 1991 at C3–4 and C4–5; (4) he had continued to suffer from chronic neck pain, and had been diagnosed with cervical spondylolysis; and he had received some rehabilitation and physical therapy, and had received at least one cervical epidural in 1999, for pain management.[41] The claimant also had a history of (5) plantar fasciitis (inflammation of the fascia) in both feet; (6) allergies, (7) dry skin, and (8) urinary difficulties. Tr. 736–737.

### *Dr. Neal Lewis, Ph.D.*

Dr. Neal Lewis testified as the ALJ's psychological expert. Dr. Lewis had reviewed Dr. Rush's September 10, 2002 consultative evaluation. He testified that, based on Dr. Rush's findings (that the claimant's attention and concentration

---

40. See pp. 1355 – 56, *supra.*

41. Dr. Cullins had reviewed two pages of billing and medication information from the Piedmont Pain Clinic, but had seen no other records of pain clinic treatment.

were within normal limits, and he was able to engage in a variety of activities), he concurred in Dr. Rush's conclusion that the claimant was generally able to meet the minimal mental requirements for unskilled work. Dr. Lewis also determined that the claimant (1) had difficulty answering questions or giving specific examples of his symptoms; and (2) would be best suited for work in a solitary setting, because he had great difficulty relating to co-workers, and would not be able to deal with the public. Apparently, Dr. Lewis was not furnished with the additional psychiatrical and psychological evidence from Dr. Jeffrey Klopper, M.D. and Dr. George Rowe, M.D., Dr. Beverly L. Boyd, Ph.D. and consultant Dr. Steven Marrinson, Ph.D. Thus, his opinion as to whether the claimant was disabled is also meaningless. Tr. 739–740.

The claimant cross-examined Dr. Lewis as to his experience in dealing with Social Security claims. The ALJ pointed out to the claimant that Dr. Lewis was merely analyzing Dr. Rush's findings "because there [are] no other mental health records," not examining the claimant himself.[42] Tr. 741.

### 4. The Claimant Submitted Additional Medical Records After the April 23, 2003 Hearing.

The claimant's records show that he submitted additional medical records after his second *de novo* hearing. On May 22, 2003, he sent 74 pages of documentation from Dr. Stork. Tr. 546–619. On May 23, 2003, he sent 12 pages of information on rehabilitation services that he had received at Kennestone Hospital in December 2002,

which documentation also indicates that the claimant did not have insurance coverage for more physical therapy at that time. Tr. 532–545.

### 5. The Claimant Requested That The ALJ Subpoena Witnesses and Schedule Another Hearing.

On May 28, 2003, the claimant wrote to the Office of Hearings and Appeals and requested that the ALJ subpoena witnesses for another hearing, including: Dr. Rush, Dr. Cullins, Dr. Lewis, Mr. Thompson, Dr. Sewell, and a Sherry Thornton. He also requested that he be provided with their opinions on his claim, in advance; and he requested that the ALJ subpoena his 1999 and 2000 records from Drs. Klopper and Rowe, and his 1998 records from Dr. Boyd.[43] Tr. 635.

On August 12, 2003, the claimant sent a second letter to the Office of Hearings and Appeals saying he would still like to schedule another hearing as soon as possible, but he would not want to question the witnesses at that hearing. Tr. 636.

The record is devoid of any evidence that the ALJ responded to either of the claimant's letters.

### 6. The ALJ Rendered Another Adverse Decision on October 30, 2003.
#### The ALJ's Sequential Findings

In his second opinion, the ALJ found that the claimant had not engaged in substantial gainful activity since August 6, 1998, his alleged disability onset date, as his 1999 earnings reflected disability payments, not earnings, from AT & T, and a

---

**42.** The claimant was concerned because Dr. Rush had not administered the battery of psychological tests that the claimant took. Dr. Lewis explained that psychologists generally have a psychometrist who administers such tests, as in the claimant's case (i.e., Dr. Diana

Gordick, Ph.D. had administered the claimant's testing). Tr. 742.

**43.** Indeed, the claimant's transcript contains only 1997 medical records from Dr. Boyd, and records from Drs. Klopper and Rowe only through March 1999.

short, unsuccessful work attempt as a hotel clerk. Finding of Fact (FOF) 2, Tr. 521; Tr. 516–517.

The ALJ also found that the claimant had met the "very low threshold" for a finding that he suffered from severe medical impairments, including (1) residual impairments associated with past musculoskeletal problems and injuries; (2) a current diagnosis of fibromyalgia; and (3) a depressed mood, with some degree of anxiety and emotional difficulties due to (a) his situation and (b) his perception of how he had been treated by AT & T. FOF 3, Tr. 521; Tr. 519.

At the third step of the sequential evaluation process, the ALJ found that the claimant had failed to provide objective medical evidence showing that his impairment(s), whether considered alone or in combination, met or equaled any condition listed in Appendix 1. FOF 4, Tr. 521; Tr. 519. The ALJ found that this was (1) consistent with the prior assessments by non examining agency physicians;[44] (2) had not contradicted the other objective medical evidence in the record; and (3) was confirmed by the two non examining medical experts who testified at the second hearing (Dr. Cullins and Dr. Lewis) as to their opinions as to the medical records in evidence. Tr. 519.

Specifically, the ALJ found that the claimant had fibromyalgia and associated pain; however, in the ALJ's opinion, the medical evidence of record showed that the claimant had responded reasonably well to therapy in late 2002 and early 2003; and, therefore, the ALJ concluded that the claimant was able to function (i.e., perform work at the SGA level) within the physical limitations identified by his treating physician, Dr. Bert A. Loftman. (Tr. 517);[45] The ALJ also found that (2) the claimant's testimony showed that he has been able to deal with his allergies in a normal household environment; and, therefore, his respiratory allergies do not impair or restrict his ability to work (i.e., he has no environmental restrictions)(Tr. 517–518); (3) the dark emotional picture and severe impairment diagnosed by Dr. Marrinson in October 2000 represented a short lived, very stressful period in the claimant's life (Tr. 518), and (4) the claimant's own testimony shows that, at least, he feels that he can work and function under proper physical circumstances, as the claimant has continued working on his doctorate degree through a correspondence program; he personally handled his employment discrimination case and his Social Security case *pro se*; and he is able to take care of his children and help with the family household; and that the claimant had adapted to his limitations by writing things down to assist his memory (Tr. 518–519).

The ALJ further found that (5) the claimant was not fully credible in so far as the claimant alleged that he could not perform any SGA on a regular and reliable basis. FOF 5, Tr. 521. The ALJ listed, and then considered, the criteria set forth in Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 for evaluating a claimant's credibility; and found that the claimant had consistently demonstrated his capacity to deal with his situation, continuing

---

44. Only Dr. Willingham completed a Physical Residual Functional Capacity Assessment on September 10, 1999.

45. As previously noted, Dr. Loftman restricted the claimant to: (a) sedentary level exertions, with very light weights of under fifteen pounds carrying and twenty pounds lifting; (b) avoiding extensive cervical or lumbar bending, lifting, twisting, or torqueing; (c) not kneeling, squatting, reaching overhead, or pushing/pulling using the extremities; and (d) only two hours standing or sitting continuously at a time during a normal eight hour day, then breaks of ten minutes every two hours, to move about, stretch and get comfortable. This is less than the requirements of light work. 20 C.F.R. 404.1567(b).

with his life and endeavors (as detailed earlier herein), such that he could function (i.e., perform SGA) in the workplace on a reliable and full time basis, within his physical limitations. Tr. 520. The ALJ also specifically found that (1) Dr. Marrinson's test results suggested that the claimant might have been exaggerating his psychiatric symptoms, (2) the claimant was no longer suffering with the severity of symptoms or problems described by Dr. Marrinson, and, therefore, those complaints no longer rendered him unable to perform SGA; and (3) the claimant's complaints were not consistent with his overall record. Tr. 518–519; 521.

The ALJ further found that the claimant has the residual functional capacity to perform SGA at the sedentary level, with effective concentration and focus, such that he could complete at least unskilled duties in a timely and successful manner, with the following limitations: that he is allowed a normal break every two hours, to alternate his position, stretch and make himself comfortable; and he is best served in solitary assignments, avoiding extensive contact with co-workers or the public. FOF 6, Tr. 521. The ALJ failed to state that the claimant had any environmental restriction. The ALJ also found that, in fact, the claimant testified that (1) he was still seeking work; (2) he could have continued working had his employer had accommodated his limitations; and (3) he could still work if the right job were presented to him.[46] Tr. 517.

At the fourth step in the sequential evaluation process, the ALJ found that, given the claimant's exertional and non-exertional limitations, he could not return to his past relevant work (FOF 7, Tr. 522), nor did the claimant's past relevant work[47] involve any transferable skills (FOF 8, Tr. 522).

At the fifth step in the sequential evaluation process, the ALJ found that the VE identified other jobs constituting SGA which an individual with the claimant's vocational profile and his retained residual functional capacity could perform, and that such jobs were available at the regional and national level in significant numbers, as identified by the VE. FOF 9, Tr. 522 The ALJ also acknowledged that the claimant might not want to work at these unskilled, entry-level jobs, given his academic degrees, his past work experiences and his perception of the positions he feels he is able to perform; but the claimant is, nonetheless clearly able to perform the identified entry level jobs successfully. Tr. 519.

Based on the medical evidence of record, and the claimant's residual functional capacity (RFC),[48] the ALJ determined that the claimant had failed to present evidence that he was unable to perform both the duties of his past relevant work, as well as other identified jobs constituting SGA. Therefore he was not disabled. Tr. 516. FOF 10, Tr. 522.

## C. *THE COMMISSIONER MADE A PROPER CREDIBILITY DETERMINATION*

The Claimant contends that there are no inconsistencies between his complaints of

---

**46.** Suffice it to say, these are the claimant's optimistic feelings which may or may not correspond to the various treating physicians' opinions.

**47.** The ALJ noted, *inter alia*, in evaluating the claimant's RFC, that claimant completed high school, college and higher degree work; his work for fifteen years as a reports clerk for AT & T had involved compiling data, verifying data, and preparing reports; and, in his resume, the claimant described his prior work at a more highly skilled level than the standard job description for such work. Tr. 516.

**48.** This includes the claimant's pain treatment records from Dr. Richard Stork.

pain and impairment (i.e., that he has made the same complaints to his treating and examining physicians), and that there are no inconsistencies between his complaints and the evidence of record as a whole, with the exception of opinions rendered by the non examining physician(s).[49] Therefore, the ALJ erred in finding that the claimant exaggerated his pain (i.e. in finding that his testimony was not credible).

The Commissioner contends that, even if the claimant can satisfy the pain standard, his allegations as to the severity and limitations resulting from his pain are not credible (i.e. his pain is not so severe that it renders him disabled from SGA).

 The Commissioner has wide latitude as the finder of fact to evaluate the weight of the evidence, including the credibility of witnesses. Indeed, credibility determinations lie exclusively within the jurisdiction of the Commissioner, not the Courts. *Ryan v. Heckler,* 762 F.2d 939 (11th Cir.1985); *Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984).

 In fulfilling this duty, the Commissioner is required to consider the claimant's testimony regarding subjective complaints of pain and other impairments. Under appropriate circumstances, he may, nevertheless, reject the claimant's testimony as not credible, provided he articulates specific reasons for his decision that the claimant is not fully credible. *Walker v. Bowen,* 826 F.2d 996 (11th Cir.1987); *Hale v. Bowen, supra; MacGregor v. Bowen,* 786 F.2d 1050, 1054 (11th Cir.1986).

 The Eleventh Circuit does not require an explicit finding as to credibility, but the implication must be obvious to the reviewing court. *Dyer v. Barnhart,* 395 F.3d 1206 (11th Cir.2005), citing *Holt v. Sullivan, supra.* The ALJ can satisfy this showing by considering, *inter alia,* the claimant's daily activities, the frequency of his symptoms, and the types and dosages of his medications. *Moore v. Barnhart,* 405 F.3d 1208 (11th Cir.2005); *Dyer v. Barnhart,* 395 F.3d at 1212. When the Commissioner has articulated his reasons for rejecting the claimant's subjective medical testimony, this Court may not substitute its own judgment for that of the Commissioner, but must affirm the Commissioner's determination if it is reasonable and supported by substantial evidence. *Powell v. Heckler,* 773 F.2d 1572 (11th Cir.1985).

 Since the claimant has attempted to establish disability through his own testimony of pain and other subjective symptoms, he must satisfy a three-part pain standard. See *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991). The Eleventh Circuit pain standard requires the ALJ to consider whether the claimant has shown: (1) evidence of an underlying medical condition, and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (3) evidence that the objectively determined medical condition is so severe that it can reasonably be expected to give rise to the alleged pain. *Id.* See also *Foote v. Chater,* 67 F.3d at 1560.

 The Eleventh Circuit does not require that the ALJ give a verbatim recitation of the pain standard; the ALJ need only make findings that indicate that he

---

**49.** The claimant contends that the ALJ failed to consider subjective testimony by his family and others, but he fails to identify the testimony to which he refers. There is no indication in the record that the claimant's family members testified at the 2000 or 2003 *de novo* hearings. The claimant attached to his brief to the Appeals Council a declaration by his wife that he has always had back, neck and other problems. This alone does not constitute material evidence of the claimant's impairments and limitations.

utilized the proper standard. *Brown v. Sullivan,* 921 F.2d 1233, 1236 (11th Cir. 1991). If the ALJ finds that the claimant's complaints are not credible, the ALJ must show that the claimant's complaints are inconsistent with his testimony and the medical record. This Court must then determine whether there is substantial evidence in the record to support the ALJ's decision. See *Johnson v. Barnhart,* 138 Fed.Appx. 186 (11th Cir.2005); *Lamb v. Bowen,* 847 F.2d 698, 702 (11th Cir.1988).

### 1. The Claimant Has Satisfied The Pain Standard

█ The medical evidence of record shows that, since undergoing a cervical fusion at C3–4 and C4–5 in September 1991, the claimant has continued to suffer with severe cervical and lumbar pain; he has utilized pain medication, physical therapy, trigger point injections, a spinal block, and lumbar and cervical epidural steroid injections in an attempt to manage his pain; and he has felt only short term pain relief. A new cervical MRI in June 20, 2002, showed that the claimant's spine had gotten worse, not better (i.e., he had spurring at the site of his prior fusion at C3–4 and C4–5, as well as bulges at the levels above (C2–3) and below (C5–6) his fusion which are causing mild to moderate impingement on the thecal sac, and narrowing of the neural foramina at C6–7), although the changes were not significant (for surgery).[50] Instead, the claimant continued with aquatic therapy, pain medication and epidural injections.

On October 17, 2002, the claimant's treating physician, Dr. Stork, also diagnosed him as suffering from fibromyalgia. In December 2002, the claimant's (aquatic)

physical therapist noted that the claimant had fibromyalgia symptomology for a long time before Dr. Stork diagnosed him as having fibromyalgia.

According to the American College of Rheumatology, fibromyalgia is a common form of generalized muscular pain, and fatigue in the muscles and fibrous connective tissues (ligaments and tendons). Its diagnosis is not detectable through diagnostic tests, but depends mostly on a person's report of complaints and symptoms, as elicited through medically accepted clinical techniques that show the existence of an impairment. See *Stewart v. Apfel,* 245 F.3d 793 (*per curiam*) (11th Cir.2000) (internal citations omitted). The claimant has testified that he helps with household tasks and his children, and has pursued his doctorate degree through a correspondence program; he has also personally handled his employment discrimination claims and Social Security claim *pro se.* However, this Court is compelled to find that the claimant's medical records[51] show that he has continued to suffer with pain, and be moderately depressed. The claimant testified that it took him nine months to complete each requirement for his doctorate, rather than one or two months; that some days he cannot get out of bed or must get back in bed. He had 17 out of 18 positive trigger points, when Dr. Stork diagnosed him with fibromyalgia in October 2002. And he was still on anti-depressant medication.

This Court is compelled to find that the claimant has presented evidence of (1) multiple underlying medical conditions, and (2) a pattern of pain management treatment over the years, for pain which is

---

**50.** See Tr. 451–452. In comparison, prior to the claimant's cervical fusion in 1991, an MRI, and a CAT scan and myelogram tests showed mild indentation on the thecal sac at C4–5 and a mild herniation at C6–7. Tr. 182–184.

**51.** The claimant's medical records do not include any evidence of medical treatment in 2001, or any evidence of medical treatment since January 2003.

severe, to him, although the severity of his pain and its limiting effects may fluctuate. Therefore, he has satisfied the Eleventh Circuit pain standard.

2. *The ALJ's Determination That The Claimant Is Not Fully Credible Is Supported By Substantial Evidence.*

 The ALJ acknowledged that the claimant suffered from severe pain, but he was not fully credible as to the severity of his pain (i.e., it was not credible that his pain was so severe that it rendered him disabled from SGA). Tr. 37–38; 521. The ALJ utilized the criteria set forth in SSR 96–7p and 20 C.F.R. § 404.1529(c)(3), to evaluate the claimant's credibility; to wit, he looked at: the claimant's activities of daily living; the location, duration, frequency and intensity of his alleged problems; precipitating and aggravating factors; the effects of medication and treatment; other treatment options, and any other factors which might limit the claimant vocationally. Specifically, relying on the claimant's own testimony and Dr. Rush's opinion, the ALJ found that the claimant had consistently demonstrated his capacity to work within his limitations: he had continued with his daily life and academic endeavors, as well as personally handling his legal and Social Security claims, thus showing that he retained the ability to engage in SGA. The VE (Dr. Sewell) also testified that an individual with the claimant's limitations can perform a wide variety of unskilled work, at the sedentary level. Tr. 520; 744–745.

The duty of this Court is not to decide facts anew, re-weigh the evidence, or substitute its judgment for that of the agency, but rather to determine if the agency's conclusion as a whole, is supported by substantial evidence in the record. In *Moore v. Barnhart, supra,* the Eleventh Circuit upheld the ALJ's credibility determination where the ALJ relied on the inconsistencies between the claimant's descriptions of her diverse daily activities, and her claims of infirmity from fibromyalgia, even though the medical records supported a diagnosis of fibromyalgia. As in *Moore,* the ALJ in the present case questioned the claimant as to why he could not work at all in light of his ability to engage in a wide range of activities. In response, the claimant did not contend that he was unable to work at all, only that he was limited to working within the restrictions identified by his doctors.

This Court is compelled to conclude that the ALJ's determination that the claimant was not fully credible is supported by substantial evidence, even though the preponderance of the medical evidence may substantiate the claimant's allegations. Therefore, the claimant is not entitled to reversal or remand of his claim based on the ALJ's credibility determination.

D. *THE ALJ PROPERLY CONSIDERED THE CLAIMANT'S IMPAIRMENTS IN COMBINATION.*

 Even if no impairment alone is disabling, the combined effect of the claimant's impairments may be enough to render the claimant disabled. *Walker v. Bowen,* 826 F.2d 996, 1001 (11th Cir.1987). The ALJ is, therefore, required to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments are disabling. The ALJ's statement that he considered a plaintiff's impairments in combination is sufficient to show that the ALJ considered the combined effect of the claimant's impairments. *See Wheeler v. Heckler,* 784 F.2d 1073, 1077 (11th Cir.1986); *Jones v. Dept. of Health and Human Services* 941 F.2d 1529, 1533 (11th Cir.1991).

 In the instant case, the ALJ stated that he considered the claimant's "com-

bined physical and emotional problems which limit him to a restricted range of duties." FOF 4, Tr. 521; Tr. 520. See also FOF 17–18, Tr. 15 and 17–18. This quotation is sufficient evidence that the ALJ considered the combined effect of the plaintiff's impairments. See *Wilson v. Barnhart,* 284 F.3d 1219,1224–25 (11th Cir. 2002). Therefore, the claimant's argument is without merit.

### E. THE ALJ WAS CORRECT IN NOT USING THE "GRIDS" TO DETERMINE WHETHER THE CLAIMANT WAS DISABLED.

The claimant contends that the ALJ erred in refusing to use the Medical Vocational Guidelines (i.e. the "Grids"), and that he is disabled under the Grid guidelines.

In appropriate circumstances, an ALJ may utilize the Medical–Vocational Guidelines to satisfy the Commissioner's burden of showing that there are other jobs which exist in the national economy that the claimant can perform; and the ALJ is authorized to find that a claimant can do a full range of work, or substantially all jobs within an exertional category. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 through 204.00; *Welch v. Bowen,* 854 F.2d 436, 439 (11th Cir.1988); *Heckler v. Campbell,* 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). However, in cases where the claimant is unable to perform a full range of work at a given level as a result of severe exertional or non-exertional impairments, application of the grids alone to direct a finding concerning disability is prohibited. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a), (d), (e); *Francis v. Heckler,* 749 F.2d 1562 (11th Cir.1985); *Broz v. Schweiker,* 677 F.2d 1351, 1361 (11th Cir.1982), *adhered to sub nom. Broz v. Heckler,* 711 F.2d 957 (11th Cir.1983).

■ When a claimant has both exertional and non exertional limitations that affect his ability to work, the ALJ is required to make a specific finding as to whether the non exertional limitations are severe enough to prevent the claimant from performing a full range of work at the residual functional capacity level indicated by the his exertional limitations. *Sryock v. Heckler,* 764 F.2d 834, 836 (11th Cir.1985). The testimony of a vocational expert is required to satisfy the Secretary's burden. *Phillips v. Barnhart,* 357 F.3d 1232 (11th Cir.2004). *Francis v. Heckler,* 749 F.2d at 1566–7; *Ferguson v. Schweiker,* 641 F.2d 243, 247 (5th Cir. 1981).

■ The claimant's undisputed medical evidence of record indicates that his non exertional impairments significantly limit his basic work skills. Dr. Marrinson diagnosed him as markedly and severely limited such that he was unable to work. More recently, Dr. Rush diagnosed the claimant with an Axis I of Cognitive Disorder—NOS and an Axis II of Obsessive–Compulsive Disorder; and, the claimant was still on anti-depressant medication. The ALJ found that the claimant is limited to work involving solitary assignments which do not involve extensive contact and interaction with the public or co-workers. Therefore, the ALJ correctly declined to rely on the Medical—Vocational Guidelines to determine the claimant's ability to perform SGA which exists in this regional or the national economy.

### F. THE ALJ COMMITTED HARMLESS ERROR IN HIS REASONS FOR THE WEIGHT GIVEN TO DR. MARRINSON'S REPORT.

■ The claimant contends that the ALJ erred when he rejected Dr. Marrinson's opinion; and that Dr. Marrinson's opinion is consistent with the claimant's

treating mental health providers (i.e., Drs. Boyd, Klopper, Rowe, and Williams [52]).

However, the ALJ found that Dr. Marrinson's opinion was (1) contradicted by his finding that the claimant's MMPI–2 validity scale results suggested the claimant had been exaggerating his psychiatric symptoms (Tr. 349); and (2) Dr. Marrinson's opinion reflected only a short-lived stressful period in the claimant's life.

▮▮▮▮ The record shows that Dr. Marrinson only saw the claimant twice in consultation, on October 19 and 24, 2000, for an evaluation. The record is devoid of any evidence of ongoing treatment of the claimant by Dr. Marrinson. Therefore, Dr. Marrinson was a consultative physician, and his opinion is not entitled to the great weight that the ALJ must give to a treating physician's opinion. 20 C.F.R. § 404.1527(d). Indeed, the opinion of a one-time examiner is not entitled to deference. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir.1987).

Nevertheless, this Court is also compelled to conclude that the ALJ misread Dr. Marrinson's report in so far as the ALJ thought Dr. Marrinson opined that the claimant may have exaggerated his symptoms, as Dr. Marrinson actually found that the claimant's overall test results were consistent on all tests, and were consistent with his observations of the claimant's difficulties with maintaining concentration, persistence and pace (Tr. 350). Furthermore, this Court is compelled to find that the ALJ failed to address the claimant's treating mental health professionals (Drs. Boyd, Klopper, Rowe and Williams), whose medical records all support Dr. Marrinson's opinion that the claimant was suffering from severe depression from at least August 1997 through October 2000.[53]

Nevertheless, the record also contains substantial evidence to support the ALJ's determination that Dr. Marrinson's opinion reflected a short-lived stressful period in the claimant's life (his situation at AT & T), and that the claimant's mental impairments had not remained at that level of severity. Specifically, the ALJ concluded that after the claimant was terminated from the job where he was allegedly experiencing harassment and employment discrimination, his depression and anxiety were not as severe. In support of this conclusion, the ALJ cited (1) the claimant's testimony as to his daily activities; (2) Dr. Rush's opinion the claimant's ability to function independently in all activities and continue with his life; and (3) the claimant's overall record. Indeed, this Court's review of the claimant's overall records

---

**52.** The claimant is apparently referring to Dr. Dirk Williams at Kennesaw Family Physicians. Tr. 242.

**53.** On August 7, 1997, the claimant told his treating physician at Kennesaw Family Physicians that he had been suffering from depression for over twelve years; that he was having thoughts of hurting someone and suicidal ideation, but had no plans for acting upon such thoughts; and that he was suffering from fatigue, insomnia, and a loss of interest in activities or enjoyment. Tr. 249–250. On September 19, 1997, the claimant began seeing Dr. Jeffrey Klopper, M.D., a psychiatrist, for medication for insomnia, depression, anxiety and panic attacks. The claimant had started seeing Dr. Beverly Boyd in July 1997; and, in August 1997, she opined that he was disabled from work effective August 15,1997, with an estimated return to work date of November 15, 1997. In November 1998, the claimant told Dr. Klopper that he was receiving disability benefits (i.e., was disabled from work). In short the claimant actively sought professional help for depression, anxiety and panic attacks from July 1997, when he first saw Dr. Boyd, through May 21, 1999, when he last saw Dr. Klopper, a period in excess of 12 months. This Court also notes that, as of December 24, 2002, the claimant was still on anti-depressant medication (Lexapro). Tr. 531.

shows that the claimant has not submitted any medical evidence to establish that he was disabled between April 2000 and April 2002, except for Dr. Marrinson's October 2000 evaluation and diagnosis that the claimant was suffering from Major Depression secondary to chronic physical problems. Yet, the claimant has testified that during that same time period, through 2001, he was able to travel to three different cities in connection with his studies for a doctorate degree; and, as already noted, he was personally handling his employment discrimination and Social Security claims, and engaging in other activities.

Setting aside for the moment whether the ALJ has fully developed the record as to the claimant's current mental health, this Court is compelled to find that there is substantial evidence to supports the ALJ's conclusion that Dr. Marrinson's opinion cannot be given great weight as to the claimant's condition at some point after October 2000.

G. *THE ALJ DID NOT FULFILL HIS DUTY TO DEVELOP A FULL AND FAIR RECORD.*

Although the burden of proof is on the claimant to prove disability, the ALJ is under a duty to conduct a full and fair inquiry into all the matters at issue. *Ford v. Secretary of Health and Human Services,* 659 F.2d 66 (5th Cir.1981).

Thus, in general, the claimant has the burden of obtaining his medical records and proving that he is disabled. 20 C.F.R. § 404.1512(a) and (c). On the other hand, the Commissioner (*nee* ALJ) has the responsibility to make every reasonable effort to develop the claimant's complete medical history, for at least the twelve months preceding the month in which the claimant filed his application and, if applicable, for the twelve month period prior to the month in which he was last insured. 20 C.F.R. § 404.1512(d).

When the medical evidence is inadequate for the Commissioner to determine whether the claimant is disabled, the Commissioner has the responsibility to re-contact the claimant's treating physician(s) or other medical source(s) and determine whether the additional information the ALJ needs is available. 20 C.F.R. § 404.1512(e). If the additional needed medical evidence is not readily available, then the ALJ should obtain a consultative examination. 20 C.F.R. §§ 404.1517 and 416.917; *Sellers v. Barnhart,* 246 F.Supp.2d 1201 (M.D.Ala.2002); *Holladay v. Bowen,* 848 F.2d 1206, 1210 (11th Cir. 1988); *Caulder v. Bowen,* 791 F.2d 872 (11th Cir.1986); *compare Murray v. Heckler,* 737 F.2d 934 (11th Cir.1984).

Additional medical evidence may be required in order to obtain more detailed medical findings about a claimant's impairment(s), to obtain technical or specialized medical information, or to resolve conflicts or differences in the medical findings already available. 20 C.F.R. §§ 404.1519a(b) and 416.919a(b). The failure of an ALJ to order a consultative examination, when such an evaluation is necessary to make an informed decision, constitutes justifiable cause for a remand to the Commissioner. *Reeves v. Heckler,* 734 F.2d 519 (11th Cir.1984); *Ford,* 659 F.2d at 69; *Turner v. Califano,* 563 F.2d 669 (5th Cir.1977).

This Court is compelled to conclude that the record establishes that additional medical records and consultative examinations were necessary for the ALJ to render an informed decision; and that the ALJ failed to fully and fairly complete the claimant's medical records. Therefore, a remand is required.

1. *The ALJ Failed to Subpoena Missing Psychological Records Requested By The Claimant.*

 In the instant case, the ALJ held the record open for thirty days to allow the claimant to submit additional medical evidence; and the ALJ offered to subpoena records for the claimant, if necessary, as provided by 20 C.F.R. § 404.950(d). The claimant, in fact, (1) submitted additional medical records on two occasions after the second hearing, as noted earlier herein; (2) wrote to the ALJ on May 28 and August 12, 2003, requesting another hearing, as soon as possible, so that he could hear the opinions of the ALJ's experts after they reviewed his additional medical records; and (3) asked the ALJ to subpoena medical records from Dr. Boyd and Drs. Klopper and Rowe, that the claimant had been unable to obtain.

The record is devoid of any evidence that the ALJ acknowledged or responded to the claimant's requests; or that the ALJ subpoenaed the claimant's psychological records. Because the ALJ found that Dr. Marrinson's diagnosis reflected only a short-lived period in the claimant's life, the additional records from Dr. Marrinson in 2000 which the claimant wanted subpoenaed are necessary to determine the actual time period during which Dr. Marrinson's opinion should be given weight. The record is also devoid of any evidence that the ALJ actually sent the claimant's additional medical records (including those submitted at the second hearing, and those submitted by the claimant after the hearing) to the three experts who testified at the second hearing; or that he obtained their opinions based on that new evidence. Neither did he advise the claimant thereof, had he done so.

This Court is, therefore, compelled to conclude that the ALJ failed to fulfill his duty to develop a full and fair record. The ALJ also failed to advise the claimant that he could submit questions to the experts (including also Dr. Rush to whose report the claimant objected at the hearing) in lieu of cross-examining them at a supplemental hearing. In short, the ALJ deprived the claimant of due process. For the reasons set forth below, this Court is further compelled to conclude that the above errors by the ALJ mandate a reversal and remand (i.e., were not harmless error).

2. *The ALJ Failed to Re–Contact the Claimant's Treating Physician or to Order A New Consultative Examination of the Claimant's Physical Limitations.*

 At the third step of the sequential evaluation process, the ALJ relied upon (1) the 1999 report of Dr. Willingham, the non examining state agency orthopedist, and (2) the testimony of Dr. Cullins, the medical examiner at the claimant's second hearing, who had seen the claimant's medical records only through 1999.

The claimant had submitted additional medical records showing that he had (1) a June 20, 2002 MRI showing adverse changes in his cervical spine; (2) repeatedly had physical therapy and continued to attempt to perform therapy on his own and, *inter alia*, have cervical and lumbar epidural steroid injections for pain management; and (3) his treating physician, Dr. Stork, diagnosed him as suffering from fibromyalgia. The Commissioner had a responsibility to re-contact the claimant's treating physician(s), in particular Dr. Stork, to determine whether he had additional medical information and could render an opinion as to the claimant's functional limitations in light of the June 20, 2002 MRI and the recent diagnosis of fibromyalgia. 20 C.F.R. § 404.1512(e). The ALJ failed to do so, and relied instead on the report of a non examining physician

and a medical adviser who had not seen all of the claimant's medical evidence. The ALJ's medical expert adviser at the second hearing (Dr. Cullins) did not review such records and, therefore, did not render an opinion as to the claimant's limitations as a result of any impairments shown by such records. Dr. Willingham, the non examining state agency orthopedist who rendered an opinion as to the claimant's limitations in 1999, also did not review the claimant's newer treatment records. Thus, his opinion is also meaningless.

The ALJ found that the claimant was able to work at the sedentary level of exertion, with no physical limitation except that he be allowed normal breaks every two hours, to alternate his position, stretch and make himself comfortable.

The Commissioner has failed to show that there was substantial medical evidence to support the ALJ's residual functional capacity determination. The ALJ should have obtained a new medical source statement as to whether the claimant was not only limited to sedentary work, but also had further restrictions beyond a normal two hour break. The ALJ cannot act as both judge and physician. See *Marbury v. Sullivan*, 957 F.2d 837, 840–41 (11th Cir.1992) (Johnson J. concurring); *Fontanez ex rel. Fontanez v. Barnhart*, 195 F.Supp.2d 1333, 1355 (S.D.Fla.2002) (ALJ erred in not obtaining a medical source statement from any of the consultants who actually examined the claimant).[54]

■ In carrying out his duty to conduct a full and fair inquiry, the ALJ is required to order a consultative examination when the record establishes that such an examination is necessary to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir.1988); *Ford*, 659 F.2d at 69; *Turner*, 563 F.2d at 671; *Scharlow v. Schweiker*, 655 F.2d 645 (5th Cir.1981). Additional medical evidence may be required in order to obtain more detailed medical findings about the claimant's impairment(s), to obtain technical or specialized medical information, or to resolve conflicts or differences in the medical findings already available. 20 C.F.R. §§ 404.1517(b) and 416.917(b).[55] If the claimant's treating physician could not provide an opinion as to the claimant's functional limitations, then the ALJ should have ordered a consultative examination rather than rely on the opinions of non examining physicians. 20 C.F.R. §§ 404.1517 and 416.917; *Caulder v. Bowen, supra.*

■ The failure of the ALJ to order a consultative examination, when such an evaluation is necessary to make an informed decision, constitutes a justifiable cause for a remand to the Secretary. *Reeves v. Heckler*, 734 F.2d 519 (11th Cir. 1984); *Ford*, 659 F.2d at 69; *Turner v. Califano*, 563 F.2d 669 (5th Cir.1977). By failing to either re-contact the claimant's treating physician or obtain a consultative physical examination that would take into consideration the claimant's medical records since 1999, the ALJ failed to fully and fairly complete the claimant's medical records.

---

**54.** *See also Rohrberg v. Apfel*, 26 F.Supp.2d 303, 311 (D.Mass.1998) (When medical findings merely diagnose the claimant's impairments without relating those impairments to specific residual functional capabilities, the Commissioner may not make that connection himself).

**55.** When a consultative examination is needed, the ALJ had a duty to re-contact the claimant's treating physician first. 20 C.F.R. § 404.1512(f); *Norman v. Apfel*, 100 F.Supp.2d 1352, 1353 (N.D.Ga.2000).

3. *The ALJ Failed To Obtain A Comprehensive Mental Status Examination As Ordered By The Appeals Council, And Thereby Failed to Fully and Fairly Develop The Claimant's Complete Medical Records.*

 As previously noted, the Appeals Council also directed the ALJ to seek one or more mental health evaluations because neither of the claimant's treating mental health providers (Drs. Klopper and Rowe), nor Dr. Marrinson, had performed a comprehensive mental health examination.

As previously noted, the ALJ obtained one new psychological evaluation from Dr. David Rush, Ph.D., whose psychometrist administered the WAIS-R (Wechsler Adult Intelligence Scale—3rd Edition), the WRAT-III (Wide Range Achievement Test—Revision 3), and a Mental Status Examination. Tr. 424. Dr. Rush's report indicates that he reviewed only the reports of Drs. Boyd, Klopper and Rowe. Therefore, he did not take into consideration the opinion of Dr. Marrinson who, after administering, *inter alia,* the MMPI-2 diagnosed the claimant as having major depression secondary to chronic physical problems, and further diagnosed that the two conditions combined to render the claimant severely impaired.

Dr. Rush rendered an opinion which he expressly stated was given without regard to any physical limitations which the claimant might have. Utilizing the DSM-IV, Dr. Rush diagnosed the claimant having an Axis I diagnosis of Cognitive Disorder-NOS and an Axis II diagnosis of Obsessive–Compulsive Disorder, no Axis III, and an Axis IV diagnosis of a history of spinal problems; and that the claimant could work forty hours a week, with his only restrictions being to avoid contact with co-workers and the public.

In light of the medical evidence of record, this Court is compelled to find that Dr. Rush did not take into consideration the more recent adverse changes in the claimant's physical condition, nor did he administer any test of adult psychosis, such as the MMPI-2 test administered by Dr. Marrinson. Thus, apparently, Dr. Rush did not administer a comprehensive mental health examination; and his opinion, rendered without regard to the claimant's physical problems, did not fully and fairly develop the claimant's mental health records.

As a result of the ALJ's failure to fully and fairly develop the claimant's medical and psychological records, as shown above, this Court is unable to determine whether there is substantial evidence to support the ALJ's findings as to whether the claimant's impairments, alone or in combination, meet or equal an impairment listed in Appendix 1; nor is this Court able to determine whether there is substantial evidence to support the ALJ's determination as to the claimant's residual functional capacity, and his ability to do his past work or other SGA. Therefore, a remand is necessary.

## H. THE ALJ DID NOT PROPERLY EVALUATE THE VOCATIONAL EVIDENCE.

[37] Once a claimant establishes that he cannot perform his past relevant work, the burden of going forward shifts to the Commissioner to show that the claimant is, nevertheless, capable of performing substantial gainful activity (i.e., that he can perform jobs which exist in significant numbers in this regional or the national economy). *Hale v. Bowen,* 831 F.2d 1007 (11th Cir.1987); *Gibson v. Heckler,* 762 F.2d 1516 (11th Cir.1985).

 A VE's testimony may be used to prove the existence of alternative work if the hypothetical question accurately includes all of the claimant's vocational and medical limitations *McSwain v. Bowen,* 814 F.2d 617, 619–20 (11th Cir.1987). At

the claimant's second *de novo* hearing, the VE testified that a person with the claimant's non-physical limitations as identified by Dr. Rush (or Dr. Lewis), would not be able to perform the claimant's past relevant work, because such a person would have great difficulty dealing with co-workers. The ALJ then asked the VE to address a hypothetical question which assumed a person with those same limitations would be able to work. The ALJ did not ask the VE to a hypothetical question involving a person with any other mental limitations such as might result from depression secondary to chronic physical problems, including progressive degenerative disc disease and fibromyalgia. In short, the ALJ failed to include all of the claimant's limitations in his hypothetical. Therefore, the ALJ erred in relying on the VE's testimony, as it did not address all of the claimant's actual impairments. As a result, a remand is required.

## I. *REMAND UNDER SENTENCE 4 OF 42 U.S.C. § 405(G) IS NECESSARY TO FULLY COMPLETE THE CLAIMANT'S RECORD.*

■■ As this Court has previously observed, the SSA ALJ Corps is vastly over-taxed, with scant help, if any, in sight. *See Brenda Bright–Jacobs v. Jo Anne B. Barnhart,* 386 F.Supp.2d 1295 (N.D.Ga., April 15, 2004) (Civ. No. 3:03–CV–029–JMF).[56] As a consequence, occasionally ALJs have been known to rely on the evidence that tends to support their decision, while ignoring other equally probative contrary evidence in the record. In such cases, a remand is mandated, where the ALJ chose to rely on the unfavorable evidence and failed to properly assess other objective evidence or the subjective evidence, or failed to properly and fully complete the claimant's record.

For the reasons set forth in the body of this decision, this Court is compelled to find that the ALJ's decision must be reversed, and this case remanded to the Commissioner to properly and fully evaluate the claimant's condition before issuing a new decision as to whether the claimant's impairments, alone or in combination, meet or equal an impairment listed in Appendix 1; the claimant's residual functional capacity; and the claimant's ability to do other SGA in this regional or the national economy.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Commissioner's decision be **REVERSED and REMANDED** for further consideration and determination of the claimant's residual functional capacity and whether there are other jobs in the national economy which the claimant can perform in light of the new decision as to his residual functional capacity.

---

**56.** Opinion modified on denial of reconsideration (October 5, 2004).